UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                   :

PETER DELGADO,                         :

                         :

                Plaintiff,          :

                         :          19 Civ. 6320 (JPC)

      -v-                        :

                         :          <u>OPINION</u>

CITY OF NEW YORK et al.,          :     <u>AND ORDER</u>

                         :

                Defendants.       :

                         :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Peter Delgado was arrested three times in 2018 and charged with a number of criminal offenses related to the illegal sale of New York City subway rides.  In early 2019, Delgado accepted an Adjournment in Contemplation of Dismissal ("ACD") for each of his charges, which ultimately terminated the criminal proceedings against him.  Later that year, he brought this action against the City of New York and several officers of the New York City Police Department ("NYPD"), alleging violations of the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. §§ 1981, 1983, 1985, and 1986, and various New York state laws.  Specifically, Delgado claims that Defendants, among other things, falsely arrested him without probable cause, maliciously caused proceedings to be initiated against him, intentionally and negligently inflicted emotional distress, denied him the right to a fair trial through the use of fabricated evidence, and violated his right to equal protection.

      Before the Court is Defendants' partial motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the below reasons, the Court grants in part and denies in part Defendants' motion.

## I. Background

### A. Documents Considered

Before delving into the factual background, the Court must address a threshold issue: which materials may it consider to decide this motion?  As discussed further below, "[t]he standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Hogan v. Fischer*, 738 F.3d 509, 514-15 (2d Cir. 2013) (quoting *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006)).  In considering a motion pursuant to Rule 12(b)(6) or Rule 12(c), "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). If a document is not incorporated by reference, a court still may consider it if the complaint "'relies heavily upon its terms and effect,' thereby rending the document 'integral' to the complaint." *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).  That is so long as "no dispute exists regarding the authenticity or accuracy of the document." *Id.* (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).  The only other materials a court may consider in this posture are "matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quoting *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)).

In support of their motion, Defendants filed a declaration from Nicholas L. Collins, attorney for Defendants.  Dkt. 31 ("Collins Declaration" or "Collins Decl.").  Attached to the Collins Declaration are several types of exhibits: (1) NYPD arrest reports (one for each of Delgado's three arrests); (2) criminal complaints (one for each incident); (3) certificates of disposition (one for each incident) showing that all proceedings were resolved by an ACD; and (4) video footage from

2

officers' body worn cameras on two of the incident dates: April 23, 2018, and May 4, 2018.  Collins Decl., Exhs. B-L.  Defendants ask the Court to consider these four categories in deciding the Rule 12(c) motion.  Dkt. 32 ("Motion") at 3-4.  Defendants do not argue that any of these documents were incorporated by reference in the First Amended Complaint, Dkt. 14 (the "Amended Complaint" or "Am. Compl."), or that they were integral to it, but rather claim that the Court can take judicial notice of them.  Motion at 3-4.

The Court may take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  "A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."  *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998)).

The three certificates of disposition show that Delgado's underlying criminal cases were resolved when he accepted an ACD for each of his charges.  Collins Decl., Exhs. H-J.  Courts routinely take judicial notice of certificates of disposition.  *See, e.g.*, *Mercano v. City of New York*, No. 15 Civ. 3544 (LGS), 2017 WL 1969676, at *1 (S.D.N.Y. May 12, 2017); *Forbes v. City of New York*, No. 15 Civ. 3458 (GHW), 2016 WL 6269602, at *4 (S.D.N.Y. Oct. 26, 2016).  Nothing suggests that these documents are inaccurate, and Delgado in fact acknowledges that "it is undisputed that the underlying criminal proceedings associated with [his] arrest[s] . . . were all terminated via ACD."  Dkt. 40 ("Opposition") at 17 (citing Collins Decl., Exhs. H-J).  Thus the three certificates of disposition fit within the requirements of Rule 201(b), and the Court will take

judicial notice of them.  *See* Fed. R. Evid. 201(b).

The arrest reports and criminal complaints, Collins Decl., Exhs. B-G, are different than the certificates of disposition because they include statements from the arresting officers describing what they claim they observed Delgado doing.  Although "several courts have taken judicial notice of incident reports, arrest reports, police reports, and similar matters on a motion to dismiss," they have done so "not for the truth of their contents, but rather to establish their existence."  *Alvarez v. Cnty. of Orange, N.Y.*, 95 F. Supp. 3d 385, 397 (S.D.N.Y. 2015) (collecting cases); *see also Glob. Network Commc'ns, Inc.*, 458 F.3d at 157; *Awelewa v. New York City*, No. 11 Civ. 778 (NRB), 2012 WL 601119, at *2 (S.D.N.Y. Feb. 23, 2012) ("Where a court takes judicial notice, it does so in order to determine what statements [the public records] contained . . . not for the truth of the matters asserted." (internal quotation marks omitted) (alterations in original)).  The cases that Defendants cite, *see* Motion at 4, confirm this.  *See Bejaoui v. City of New York*, No. 13 Civ. 5667 (NGG), 2015 WL 1529633, at *6 (E.D.N.Y. Mar. 31, 2015) (taking judicial notice of a state court indictment "not for the truth of the matters asserted, but to establish [its] existence and legal effect"); *Garnett v. City of New York*, No. 13 Civ. 7083 (JSR), 2014 WL 1383255, at *2 (S.D.N.Y. Apr. 4, 2014) (taking judicial notice of an underlying criminal complaint "not for the truth of the matters asserted" but instead only "to establish the fact of such ligation and related filings") (quoting *Glob. Network Commc'ns, Inc.*, 458 F.3d at 157)); *Liang v. City of New York*, No. 10 Civ. 3089 (ENV), 2013 WL 5366394, at *5 (E.D.N.Y. Sept. 24, 2013) (taking judicial notice of arrest reports and similar documents "only to establish their existence and legal effect, or to determine what statements [they] contained" but "not for the truth of the matters asserted"), *aff'd sub nom. Liang v. Zee*, 764 F. App'x 103 (2d Cir. 2019).  And at oral argument on their motion, Defendants agreed that the Court may not consider the truth of the matters asserted in these documents.  5/26/21 Tr. at

11.  Accordingly, the Court will take judicial notice of the arrest reports and criminal complaints, Collins Decl., Exhs. B-G, to establish their existence and take note of the statements that they contain, but not for the truth of their contents.

Finally, at oral argument, Defendants acknowledged that the Court cannot take judicial notice of the body worn camera footage in the present posture.  5/26/2021 Tr. at 14.  Courts in this District have emphasized that "extraneous videos documenting the events in question are not properly considered on a motion to dismiss unless the plaintiff relied upon the videos when drafting the complaint."  *Ashley v. Gonzalez*, No. 19 Civ. 6282 (AJN), 2020 WL 7027501, at *2 (S.D.N.Y. Nov. 30, 2020) (collecting cases); *see also Lurch v. City of New York*, No. 19 Civ. 11254 (VEC) (OTW), 2021 WL 842616, at *4 n.2 (S.D.N.Y. Feb. 10, 2021), *report and recommendation adopted*, 2021 WL 1172506 (S.D.N.Y. Mar. 29, 2021); *cf. Hershey v. Goldstein*, 938 F. Supp. 2d 491, 498 n.1 (S.D.N.Y. 2013) (considering security camera footage of events described in the amended complaint because the plaintiff "reference[d] this video footage in the Amended Complaint" and "attached some of this footage to it").  Because Delgado does not rely on the body worn camera footage in the Amended Complaint, the Court declines to take judicial notice of these videos, Collins Decl., Exhs. K-L, for purposes of Defendants' Rule 12(c) motion.

## B.  Factual Background

Having determined which materials it may consider at this stage, the Court now turns to the factual allegations at issue.  The following facts are taken primarily from the Amended Complaint. For purposes of resolving Defendants' Rule 12(c) motion only, the Court accepts the Amended Complaint's factual allegations as true and "draw[s] all inferences in the plaintiff's favor."  *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015).  As discussed above, the Court also considers the arrest reports, criminal complaints, and ACDs that Defendants submitted in support of their motion,

Collins Decl., Exhs. B-J, but does not accept as true contested facts contained within these documents. *See Glob. Network Commc'ns, Inc.*, 458 F.3d at 157; *Leonard F.*, 199 F.3d at 107.

Delgado describes himself in the Amended Complaint as a "Hispanic or African-American" man who resides in the Bronx. Am. Compl. ¶ 7. The events giving rise to his claims occurred on three separate days in 2018 while he was in a Manhattan subway station. *See id.* ¶¶ 2, 21, 40, 61.

The first incident occurred on April 23, 2018. *See id.* ¶¶ 21-39. At approximately 2:15 p.m., Delgado was "in the process of giving others directions in front of a map" inside a subway station at the corner of 7th Avenue and West 47th Street. *Id.* ¶ 21. NYPD Officer Md Samsuddin approached Delgado, "violently shove[d]" him against a wall, "contort[ed] his arms and body" in order to place metal handcuffs on his wrists, and searched him. *Id.* ¶¶ 22-25. Officer Samsuddin claimed that this occurred because he saw Delgado "enable another individual to enter the subway platform without permission or authority to do so." *Id.* ¶ 31; *accord* Collins Decl., Exhs. B (arrest report containing similar allegations), E (criminal complaint containing similar allegations). Officer Samsuddin also said that he found "two bent MetroCards" in Delgado's possession. Am. Compl. ¶ 31. When bent in a certain way, New York City MetroCards apparently can be used to obtain a free subway ride. *Id.* ¶ 30; *see also People v. Mattocks*, 12 N.Y.3d 326, 330 (2009) ("When there is a strategically-placed crease or bend on the card, the turnstile computer will . . . give[] the user of the card a free entry to the subway."). Delgado says that Samsuddin fabricated his version of the events and that the police actually had no reason to approach him. Am. Compl. ¶¶ 22, 29, 31. Delgado was arrested and detained for approximately twenty-three hours before he was released on April 24, 2018. *Id.* ¶¶ 28, 32-33, 36-37. He was charged with Criminal Possession of a Forged Instrument in the Third Degree and Unauthorized Sale of Certain Transportation Services. *Id.* ¶ 28; *see also* Collins Decl., Exh. E.

The second incident occurred less than two weeks later on May 4, 2018.  Am. Compl. ¶¶ 40-60.  At approximately 6:30 p.m., Delgado was again "in the process of giving others directions in front of a map" inside a subway station at the corner of 7th Avenue and West 49th Street.  *Id.* ¶ 40.  NYPD Officers Wilfred Martinez, Kyle Ting, and Luis Rodriguez approached Delgado, "violently and forcefully pushed [him] against the wall," handcuffed him, and searched him.  *Id.* ¶¶ 41-43.  Officer Ting said that he saw Delgado "receive[] money from several individuals and then proceed[] to open the emergency gate to allow [the individuals] to enter the subway platform."  *Id.* ¶ 49; *accord* Collins Decl., Exhs. C (arrest record containing similar allegations), F (criminal complaint containing similar allegations).  And Officer Martinez claimed that he recovered a bent MetroCard from Delgado.  Am. Compl. ¶ 48; *accord* Collins Decl., Exh. F (criminal complaint containing similar allegations).  Delgado alleges that Officers Ting and Martinez lied, and he maintains that he did nothing wrong.  Am. Compl. ¶¶ 41, 48-49.  Delgado again was arrested, detained for approximately seventeen hours, and released the next day.  *Id.* ¶¶ 46, 54, 56-58.  He was charged with Possession of Burglar's Tools, Criminal Possession of a Forged Instrument in the Third Degree, Unlawful Sale or Reproduction of a MetroCard, and Loitering.  Collins Decl., Exh. F; *see also* Am. Compl. ¶ 46.[1]

The third and final incident occurred several months later on September 22, 2018.  *Id.* ¶¶ 61-77.  At approximately 6:15 p.m., Delgado alleges he was once again "in the process of giving others directions in front of a map" in a subway station located at 7th Avenue and West 49th Street.  *Id.* ¶ 61.  Officers Martinez, Ting, and Robinson approached him.  *Id.* ¶ 62.  "[E]ach proceeded to push [him] against a nearby wall" and search him.  *Id.* ¶¶ 63-64.  Officer Ting said they did this because

---

[1] The Amended Complaint alleges that Delgado was also charged with Theft of Services and Criminal Trespass in the Third Degree, but the criminal complaint and certificate of disposition suggest that he was not.  *See* Collins Decl., Exhs. F, I.

he saw Delgado "place[] a piece of tape along the magnetic strip of the emergency gate to the subway platform, so that the gate would be prevented from fully closing." *Id.* ¶ 69.  Officer Ting said he then saw Delgado "approach[] various individuals" and tell them he would let them through the emergency gate for a small fee.  *Id.*  Eventually, five individuals gave Delgado a total of $5.00, and Delgado opened the gate for them.  *Id.*  The arrest report and criminal complaint for this incident contain similar allegations.  *See* Collins Decl., Exhs. D, G.  In line with the first two events, Delgado claims that the officers fabricated their accounts.  Am. Compl. ¶¶ 67-71.  Delgado was arrested, detained for approximately nineteen hours, and released the following day.  *Id.* ¶¶ 67, 73, 75, 77.  This time, he was charged with Criminal Tampering in the Second Degree, Unlawful Sale or Reproduction of a MetroCard, Loitering, and Unlawful Solicitation in the Subway.  *Id.* ¶ 67; *accord* Collins Decl., Exh. G.

Following these incidents, Delgado was required to return to court numerous times.  Am. Compl. ¶¶ 38, 59, 78.  On February 28, 2019, Delgado accepted ACDs for his pending criminal charges stemming from these three incidents.  Collins Decl., Exhs. H-J.  This meant that all of his charges were then dismissed in late August 2019.  *See* Am. Compl. ¶ 78; Collins Decl., Exhs. H-J.

## C.  Procedural History

Delgado initiated this action on July 8, 2019, Dkt. 1, and filed the Amended Complaint on November 26, 2019 against the City of New York, Officer Samsuddin, Officer Martinez, Officer Ting, and Officer Rodriguez.[2]  The Court refers to the City of New York as "the City," and the four officers together as the "Individual Defendants."  The Amended Complaint contains eighteen causes of action:  (1) unlawful search and seizure under New York law; (2) unlawful search and seizure pursuant to section 1983 against the Individual Defendants; (3) false arrest and false

---

[2] The Amended Complaint also named ten John or Jane Does, but Delgado voluntarily dismissed these parties on August 26, 2020.  *See* Dkt. 29.

imprisonment under New York law; (4) false arrest and false imprisonment pursuant to section 1983 against the Individual Defendants; (5) assault and battery under New York law; (6) excessive force pursuant to section 1983 against the Individual Defendants; (7) malicious abuse of process under New York law; (8) malicious abuse of process pursuant to section 1983 against the Individual Defendants; (9) intentional and negligent infliction of emotional distress under New York law; (10) denial of the right to a fair trial under New York law; (11) denial of the right to a fair trial pursuant to section 1983 against the Individual Defendants; (12) deprivation of rights and denial of equal protection of the laws under New York law; (13) deprivation of rights and denial of equal protection of the laws pursuant to sections 1981 and 1983 against the Individual Defendants; (14) conspiracy to interfere with civil rights and failure to prevent the conspiracy pursuant to sections 1983, 1985, and 1986 against the Individual Defendants; (15) failure to intervene under New York law; (16) failure to intervene pursuant to section 1983 against the Individual Defendants; (17) negligent hiring, retention, and supervision under New York law; and (18) municipal liability, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), against the City pursuant to section 1983. Defendants answered the Amended Complaint on February 18, 2020.  Dkt. 20.  On August 26, 2020, the Court entered a joint stipulation in which Delgado dismissed his federal law claim for excessive force, *i.e.*, the Sixth Cause of Action.  Dkt. 29.[3]  Thus, seventeen claims remain.

On September 21, 2020, Defendants filed a partial motion for judgment on the pleadings pursuant to Rule 12(c).  Dkt. 30.  Defendants seek dismissal of all remaining claims except the First, Second, Seventeenth, and Eighteenth Causes of Action.  *See* 5/26/21 Tr. at 8.  Because Defendants filed several extrinsic documents as part of this motion, they requested that, in the

---

[3] The joint stipulation also purported to dismiss a federal claim for malicious prosecution. *See* Dkt. 29.  But the Amended Complaint did not bring such a claim, and the parties agree this was an error.  *See* 5/26/21 Tr. at 4-5.

alternative, the Court convert this motion to one for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Motion at 4-5.  This case was reassigned to the undersigned on September 29, 2020.  Delgado filed his Opposition to Defendants' motion on October 26, 2020.  Dkt. 40.  Defendants replied on December 18, 2020.  Dkt. 48 ("Reply").  The Court heard oral argument on May 26, 2021.  With Court approval, the parties filed on June 2, 2021 supplemental letter-briefs regarding Defendants' motion as to Delgado's equal protection claims.  Dkts. 54, 55.

## II.  Legal Standard

### A.  Rule 12(c) Standard

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  As previously noted, "[t]he standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim."  *Hogan*, 738 F.3d at 514-15 (quoting *Cleveland*, 448 at 521).  Thus, "[t]o survive a Rule 12(c) motion, [the] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (quoting *Johnson v. Rowley*, 569 F.3d 40, 44 (2d Cir. 2009) (per curiam)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro*, 807 F.3d at 544, it need not "accept as true legal conclusions couched as factual allegations," *Lafaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

## B.  Conversion to a Rule 56 Motion

In the context of a Rule 12(c) motion, if matters outside the pleadings are presented by a party, the court has a choice.  It can either exclude those items and not consider them or it can convert the motion to one for summary judgment under Rule 56.  *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *Rusis v. Int'l Bus. Machs. Corp.*, No. 18 Civ. 8434 (VEC), 2021 WL 1164659, at *3 (S.D.N.Y. Mar. 26, 2021). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor."  *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

If the court converts the motion to one for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  "The essential inquiry in determining whether it is appropriate to convert a motion for judgment on the pleadings into a motion for summary judgment is 'whether the non-movant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings.'"  *Costor v. Sanders*, No. 07 Civ. 11311 (NRB), 2009 WL 1834374, at *2 (S.D.N.Y.

11

June 16, 2009) (quoting *Krijn v. Pogue Simone Real Estate Co.*, 896 F.2d 687, 689 (2d Cir. 1990)).

As discussed above, Defendants submitted matters outside the pleadings for the Court to consider (arrest reports, criminal complaints, ACDs, and body worn camera footage). *See* Collins Decl., Exhs. B-L.  Defendants requested that the Court convert their Rule 12(c) motion into one for summary judgment in the event that it declines to consider these materials.  Motion at 4-5.  In his Opposition, Delgado noted that "because [D]efendants' motion for judgment on the pleadings relies so extensively upon materials outside the pleadings, materials that may only properly be considered upon conversion to a motion for summary judgment, pursuant to Fed. R. Civ. P. 56, [he] has opposed it as such."  Opposition at 9; *see also* 5/26/21 Tr. at 25.  Delgado thus recognized the possibility that the Court could convert Defendants' motion to one for summary judgment and therefore had an opportunity to present any relevant material.  *See Allen v. Leonard*, No. 18 Civ. 7163 (SJF) (AKT), 2020 WL 4587752, at *5 (E.D.N.Y. Mar. 3, 2020) (collecting cases), *report and recommendation adopted*, 2020 WL 2537280 (E.D.N.Y. May 19, 2020).

Even though Delgado would not be taken by surprise if the Court were to convert Defendants' motion to one for summary judgment, the question of whether it should do so is a separate inquiry.  "Federal courts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings offered in conjunction with a [Rule 12(c)] motion, and thus complete discretion in determining whether to convert the motion to one for summary judgment."  *Kouakou v. Fideliscare N.Y.*, 920 F. Supp. 2d 391, 396 (S.D.N.Y. 2012) (alteration in original) (internal quotation marks omitted); *accord Bruno v. City of New York*, No. 17 Civ. 7552 (PGG), 2019 WL 690340, at *1 (S.D.N.Y. Feb. 19, 2019).  In exercising this discretion, a court "looks to the substance of the motion."  *Stephens v. Bayview Nursing & Rehab. Ctr.*, No. 07 Civ. 596 (JFB), 2008 WL 728896, at *3 (E.D.N.Y. Mar. 17, 2008) (quoting *Ansonia*

*Tenants' Coal., Inc. v. Ansonia Assocs.*, 163 F.R.D. 468, 470 (S.D.N.Y. 1995)).   In addition, converting a Rule 12(c) motion to one for summary judgment is particularly inappropriate where material factual disputes remain, and relevant facts may be unearthed during discovery.   *See Wajilam Exps. (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*, 475 F. Supp. 2d 275, 278 (S.D.N.Y. 2006) ("There would be little point in considering a summary judgment motion when significant relevant facts may yet be discovered."); *accord Allen*, 2020 WL 4587752, at *7.

The Court will not exercise its discretion to do so here.   The arrest reports and criminal complaints contain statements from the Individual Defendants describing Delgado's conduct that they allege they witnessed.   *See, e.g.*, Collins Decl., Exhs. B ("[Delgado] was observed swiping multiple people to get access into [the subway] in exchange of unknown amount of [cash]."), E ("I saw [Delgado] receive money from a person, money that otherwise would have been owed and paid to the New York City Transit Authority as a lawful fare, and then saw [Delgado] swipe a [M]etro[C]ard, move away from the turnstile so that the individual could pass through the turnstile, allowing this person to enter the subway station beyond the turnstiles without permission or authority to do so.").   But the core of Delgado's case is that the Individual Defendants lied about these matters.   *See, e.g.*, Am. Compl. ¶¶ 31 ("Defendant Samsuddin fabricated false evidence to [be] used against [Delgado], namely that he observed [Delgado] unlawfully enable another individual to enter the subway platform without permission or authority to do so, without paying the fare th[at] was lawfully owed to the New York City Transit Authority."), 48 ("Defendant Martinez fabricated false evidence against [Delgado], namely that he recovered a bent MetroCard that could purportedly be used to gain free entrance to the subway platform."), 49 ("Defendant Ting fabricated false evidence against [Delgado], namely his purported observations [that Delgado] received money from several individuals and then proceeded to open the emergency gate to allow

them to enter the subway platform, which he then forwarded to prosecutors."), 51 ("Defendant Rodriguez also fabricated false evidence against [Delgado], namely that [D]efendant Rodriguez recovered two MetroCard[s] from the vicinity of the emergency gate, which he then forwarded to prosecutors."); *see also id.* ¶¶ 69, 84, 86, 183.   Key facts are therefore far from undisputed.  *See Allen*, 2020 WL 4587752, at *7.

Nor would the body worn camera footage from the April 23, 2018 and May 4, 2018 arrests help get to the "substance" of the motion.  *Stephens*, 2008 WL 728896, at *3.   In these videos, Delgado appears to admit that he was "panhandling," *see* Collins Decl., Exhs. K, L, and Defendants argue that these statements corroborate the officers' accounts and prove the officers had probable cause to arrest Delgado.   Motion at 7; Reply at 3.   But the footage submitted to the Court only shows what transpired after Delgado was already in handcuffs and being searched, *see* Collins Decl., Exhs. K, L, and thus does little to show whether "the facts known to the arresting officer at the time of the arrest" would support a reasonable conclusion that probable cause existed. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

Although the parties have exchanged a number of documents through the Local Civil Rule 83.10 Plan, *see* 5/26/21 Tr. at 11-12, discovery has been stayed in this matter since September 24, 2020, *see* Dkt. 34, and depositions have not been taken, *see* 5/26/21 Tr. at 11-12.   Further discovery may well show that Defendants are ultimately correct and that the officers did not fabricate their accounts.   But in the present posture, and based on the limited evidence submitted, the Court concludes that "the documentary evidence submitted in support of Defendants' motion is simply too scant and incomplete to enable a rationale determination of a summary judgment motion." *Allen*, 2020 WL 4587752, at *7.   Instead, and as discussed below, the Court concludes that further discovery is necessary to resolve Delgado's false arrest and false imprisonment claims.  *See, e.g.,*

*Wajilam Exports (Singapore) Pte. Ltd.*, 475 F. Supp. 2d at 278 (declining to convert a Rule 12(c) motion into one for summary judgment when "significant relevant facts may yet be discovered"); *see also Kouakou*, 920 F. Supp. 2d at 396 ("[B]ecause discovery remains ongoing, the Court declines to convert Defendant's motion into a Rule 56 motion for summary judgment."). Accordingly, the Court declines to exercise its discretion to convert Defendants' Rule 12(c) motion to one for summary judgment and will evaluate this motion under the standard that applies for a Rule 12(b)(6) motion. *See Hogan*, 738 F.3d at 514-15.

### III.  Discussion

#### A.  False Arrest, False Imprisonment, and Failure to Intervene

Delgado brings claims for false arrest and false imprisonment pursuant to New York law and 42 U.S.C. § 1983 stemming from his three arrests. Am. Compl. ¶¶ 133-144. He also alleges that the Individual Defendants who were present during his arrests but did not actively participate in the alleged conduct failed to intervene as required. *Id.* ¶¶ 214-221.

"A § 1983 claim for false arrest, rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). This claim "is substantially the same as a claim for false arrest under New York law." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (per curiam) (quoting *Weyant*, 101 F.3d at 852). "Under New York law, to prevail on a claim for false arrest, a plaintiff must show that '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021) (alteration in original) (quoting *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003)); *accord Broughton v. State of New York*, 37 N.Y.2d 451, 456 (1975).

"Probable cause to arrest is a complete defense to an action for false arrest." *Ashley*, 992 F.3d at 136. "Probable cause to arrest exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007); *accord Weyant*, 101 F.3d at 852. "[I]t is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of the arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006). Thus, "Defendants prevail if there was probable cause to arrest Plaintiff[] for any single offense." *Marcavage v. City of New York*, 689 F.3d 98, 109-10 (2d Cir. 2012); *see also Wallace v. City of Albany*, 725 N.Y.S.2d 728, 730 (App. Div. 2001) (concluding the same under New York law).

The Amended Complaint alleges that Defendants "each lacked the requisite probable cause or reasonable suspicion to stop, question, search, arrest, and subsequently cause criminal prosecutions to be initiated against . . . Delgado," Am. Compl. ¶ 82, and "were involved in the decision to arrest [Delgado] without probable cause or failed to intervene when they observed others arresting [Delgado] without probable cause," *id.* ¶ 90; *see also id.* ¶¶ 134, 142. Defendants move for judgment on Delgado's false arrest and false imprisonment claims based on the April and May arrests (but not the September arrest) because they say these arrests were supported by probable cause. Motion at 5-7. Defendants do not argue that the allegations in the Amended Complaint are implausible, but instead rely solely on extrinsic evidence, namely the arrest records, criminal complaints, and body worn camera footage. Because the Court declines to convert this motion to one for summary judgment, it will not consider these materials for the truth of any of the factual matters asserted therein. Instead, the question is whether Delgado's pleading contains "sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hayden*, 594 F.3d at 160.

Delgado alleges that on April 23, 2018, and May 4, 2018, he was standing in front of a subway map when NYPD officers approached him. Am. Compl. ¶¶ 21-22, 40-41. The officers then allegedly handcuffed him and searched him. *Id.* ¶¶ 24-26, 42-44. Delgado admits that his arresting officers claimed to have observed him giving people illegal access to the subway, and that they claimed to have found fraudulent MetroCards in his possession, but he says that they made this all up. *Id.* ¶¶ 29-31, 47-49. Whether Delgado or the Individual Defendants are correct cannot be determined at this stage of the litigation. The Court thus concludes that Delgado has adequately pleaded a lack of probable cause.

Still, Defendants argue that, even if they did not have probable cause, they are entitled to qualified immunity with regard to these arrests. Motion at 19-21. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). The right to be free from arrest without probable cause was a clearly established right at the time of Delgado's arrests. *See Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007). When a right is clearly established, the question is "whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010)). In the context of false arrest, an officer's probable cause determination is "objectively reasonable" if there was "'arguable' probable cause at the time of the arrest—that is, if 'officers of reasonable competence could disagree on whether the probable cause test was met.'" *Id.* at 157 (quoting *Jenkins*, 478 F.3d at 87).

Defendants argue that the officers here had arguable probable cause because body worn camera footage shows that Delgado admitted to panhandling after he was handcuffed.  Motion at 20-21.  As mentioned above, the Court will not consider these videos in the present posture.  And even if it were to, these videos captured events that occurred after Delgado's arrests on April 23, 2018, and May 4, 2018, *see* Collins Decl., Exhs. K, L, whereas the qualified immunity analysis looks at the objective reasonableness of the preceding decisions to make those arrests.  *See Devenpeck*, 543 U.S. at 152.  Thus, Defendants' qualified immunity argument fails for the same reason as their probable cause argument.  While it may be established at a later stage in this litigation that the Individual Defendants acted in an objectively reasonable manner, and at a later point of this litigation the body worn camera footage may be admissible against Delgado depending on the issues in dispute, nothing in the pleadings shows that the Individual Defendants had even arguable probable cause to arrest Delgado on April 23, 2018, or May 4, 2018.  Accordingly, Delgado's false arrest and false imprisonment claims, brought in the Third and Fourth Causes of Action, survive Defendants' Motion.  *See Sullivan v. City of New York*, No. 17 Civ. 3779 (KPF), 2018 WL 3368706, at *8 (S.D.N.Y. July 10, 2018) (denying a motion to dismiss because the court could not conclude, as a matter of law, that the arresting officers had probable cause or arguable probable cause to arrest the plaintiff); *Gomez v. City of New York*, No. 16 Civ. 1274 (NGG), 2017 WL 1034690, at *6-7 (E.D.N.Y. Mar. 16, 2017) (denying a motion for judgment on the pleadings because the plaintiff adequately had pleaded a lack of probable cause and nothing supported a finding of arguable probable cause).

Defendants also move for judgment on Delgado's failure to intervene claims, brought in the Fifteenth and Sixteenth Causes of Action, arguing that since Delgado "cannot establish claims for false arrest/false imprisonment," his failure to intervene claims must fail as well.  Motion at 13-14.

Because the Court holds that his false arrest and false imprisonment claims may proceed, it also declines to dismiss his failure to intervene claims since they are tied to the same alleged constitutional violations.[4]

## B.  Denial of the Right to a Fair Trial Due to Fabricated Evidence

Delgado also brings a section 1983 claim for denial of his right to a fair trial alleging that Defendants fabricated evidence for use in his prosecution, namely the officers' eyewitness accounts and their claims that they found bent MetroCards in his possession.  *See* Am. Compl. ¶ 183.  He alleges that the purported fabricated evidence "was likely to influence a jury's decision," deprived him of a fair trial, and "caused post-arraignment restrictions to be imposed on his liberty and freedom of movement."  *Id.* ¶¶ 183-184.   Delgado makes identical allegations in support of his claim for denial of his right to a fair trial under New York law.  *Id.* ¶¶ 176-181.  The Court refers to each of these claims as a "fabricated-evidence claim."  *See Ashley*, 992 F.3d at 132 & n.1.

The "threshold inquiry in a § 1983 suit" requires a court to "'identify the specific constitutional right' at issue."  *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 920 (2017) (quoting *Albright v. Oliver*, 510 U.S. 266, 271 (1994)).  Only then may courts "determine the elements of, and rules associated with, an action seeking damages for its violation."  *Id.*  The curious thing about a fabricated-evidence claim is that there remains uncertainty about the "specific constitutional right" that it implicates.  *See McDonough v. Smith*, 139 S. Ct. 2149, 2161 (2019) (Thomas, J., dissenting) (quoting *Manuel*, 137 S. Ct. at 920).  In a recent case, the Supreme Court assumed, without deciding, that such a claim arises under the Due Process Clauses of the Fifth and Fourteenth

---

[4] At oral argument, Defendants maintained that they also moved to dismiss Delgado's claim for assault and battery (the Fifth Cause of Action) because "a state claim for assault and battery . . . has the same elements as a claim for false arrest."  5/26/21 Tr. at 8.  The Court finds no mention of this argument in Defendants' Motion.  Either way, because Delgado's false arrest claims survive Defendants' motion, so too does Delgado's assault and battery claim.

Amendments.  *Id.* at 2155.  But the Court expressed "no view as to what other constitutional provisions (if any) might provide safeguards against the creation or use of fabricated evidence enforceable through a 42 U.S.C. § 1983 action."  *Id.* at 2155 n.2.  In his Amended Complaint, Delgado alleges that his section 1983 fabricated-evidence claim sounds in the rights guaranteed by the Sixth and Fourteenth Amendments.  Am. Compl. ¶ 185; *see also id.* ¶ 179 (in connection with state fabricated-evidence claim, alleging violations of Delgado's "right to fair trial, pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, Article I, Sections 1, 2 and 6 of the New York State Constitution, as well as Article II, Section 12, of the New York State Civil Rights Law").  And some courts have said that the claim comes, at least in part, from the Sixth Amendment.  *See, e.g.*, *Hincapie v. City of New York*, 434 F. Supp. 3d 61, 75 n.8 (S.D.N.Y. 2020) ("The claim of denial of the right to a fair trial due to fabricated evidence stems from the Sixth Amendment and the Due Process clauses of the Fifth, Sixth, [and] Fourteenth Amendments of the U.S. Constitution." (citing *Holbrook v. Flynn*, 475 U.S. 560 (1986)).

While the Second Circuit has yet to address whether the Sixth Amendment may ground a fabricated-evidence claim, *see Garnett v. Undercover Officer C0039*, 838 F.3d 265, 276 n.6 (2d Cir. 2016) ("Whether this right is rooted in the Sixth Amendment or Fifth and Fourteenth Amendments, or both, is an issue we need not decide . . . ."), it has traditionally treated the claim as one arising under the Due Process Clauses of the Fifth and Fourteenth Amendments, *see McDonough v. Smith*, 898 F.3d 259, 266 (2d Cir. 2018), *rev'd on other grounds*, 139 S. Ct. 2149 (2019).  "To succeed on a fabricated-evidence claim, a plaintiff must establish that 'an (1) investigating official (2) fabricate[d] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[red] a deprivation of life, liberty, or property as a result.'"  *Ashley*, 992 F.3d at 139 (alterations in original) (quoting

*Garnett*, 838 F.3d at 279).  Delgado does not argue that the elements of a Sixth Amendment fabricated-evidence claim would be any different, and in all events, none of these elements are called into question here.  Instead, Delgado and Defendants dispute whether a fabricated-evidence claim requires an additional element: that the underlying criminal proceedings terminated in the plaintiff's favor.  Motion at 9-10; Opposition at 17-19.  The answer to this question turns largely on the Supreme Court's recent decision in *McDonough*.

In that case, a county board of elections commissioner was charged with crimes related to forged absentee ballots.  *McDonough*, 139 S. Ct. at 2153.  He was acquitted on all charges and subsequently brought a fabricated-evidence claim.  *Id.* at 2154.  The Second Circuit dismissed the claim as untimely, and the Supreme Court granted certiorari to decide when the statute of limitations for the claim began to run.  *Id.*  The Court held that the limitations period for the petitioner's fabricated-evidence claim "began to run when the criminal proceedings against him terminated in his favor—that is, when he was acquitted." *Id.* at 2161.  More on the rationale behind this in a bit.  But, the point to highlight upfront is that *McDonough* only dealt with a statute of limitations issue.  After *McDonough* though, courts have grappled with whether favorable-termination is not just the accrual date for limitations purposes, but also is a substantive element of a fabricated-evidence claim.  *See, e.g.*, *Miller v. Terrillion*, 436 F. Supp. 3d 598, 601 (E.D.N.Y. 2020).

The Second Circuit recently suggested that it is.  In *Ashley*, a jury found against the plaintiff on his fabricated-evidence claim.  992 F.3d at 138.  The plaintiff appealed, challenging, among other things, the jury instructions.  *Id.*  The defendants argued that any possible jury instruction errors were harmless because under *McDonough* the plaintiff had to show that the underlying prosecution terminated in his favor, and he had not done so.  *Id.* at 139-40.  The court rejected this argument and held that the plaintiff's "state criminal case terminated favorably to him." *Id.* at 141-

42.  The court recognized that favorable termination may mean different things for different types of claims, *see id.* at 140 (citing *McDonough*, 139 S. Ct. at 2160 n.10), but did not elaborate on this point because it concluded that the plaintiff's criminal case was resolved in his favor regardless of the standard, *see id.* at 142.

In reaching this conclusion, the Second Circuit appeared to assume that favorable termination is an element of a fabricated-evidence claim after *McDonough*, but, without that precise issue before the court, did not explicitly hold as much.  *See id.* at 140-42.  Nonetheless, the court referred to "the favorable termination requirement for fabricated-evidence claims," *id.* at 140, and said nothing to suggest that the reasoning in *McDonough* should be limited to the statute of limitations issue.  Further, most district courts in this Circuit "read *McDonough* to require favorable termination in fair trial claims that allege a deprivation of liberty resulting from the use of fabricated evidence in a criminal proceeding."  *Kayo v. Mertz*, No. 19 Civ. 365 (PAE), 2021 WL 1226869, at *17 (S.D.N.Y. Mar. 31, 2021) (collecting cases); *see also Smalls v. Collins*, No. 14 Civ. 2326 (CBA), 2020 WL 2563393, at *3 (E.D.N.Y. Mar. 16, 2020) ("Although the issue presented in *McDonough* was the accrual date of a fair-trial claim under [42] U.S.C. § 1983, the opinion's reasoning strongly suggests that the Supreme Court would hold that favorable termination is a requirement of a fair-trial claim, at least in cases in which the plaintiff alleges a deprivation of liberty resulting from the use of fabricated evidence in a criminal proceeding.").  It is difficult to square *Ashley* with Delgado's position that favorable termination is not a substantive element of a fabricated-evidence claim.  But because *Ashley* arguably did not deal with this exact issue, the Court will conduct a further analysis to determine whether favorable termination is in fact a requirement of Delgado's fabricated-evidence claim post-*McDonough*.

As one court put it, the "effect of *McDonough* . . . can best be understood as operating in

the shadow" of two prior Supreme Court cases: *Heck v. Humphrey*, 512 U.S. 477 (1994) and *Wallace v. Kato*, 549 U.S. 384 (2007). *Miller*, 436 F. Supp. 3d at 601. So to understand the import of *McDonough*, which dealt extensively with these two cases, it is first necessary to have some understanding of these precedents.

In *Heck*, a man was convicted of voluntary manslaughter and sentenced to prison. 512 U.S. at 478. While his appeal from his conviction was pending, he filed a section 1983 suit against state prosecutors and an investigator alleging that they destroyed exculpatory evidence and caused an "illegal and unlawful voice identification procedure" to be used at trial. *Id.* at 478-79 (internal quotation marks omitted). The Supreme Court held that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid," a section 1983 plaintiff must prove that his conviction had been somehow invalidated—*i.e.*, he must show that "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 486-87. Since Heck's conviction remained intact, he could not bring his section 1983 claims because "civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments." *Id.* at 486. In some sense, *Heck* is not directly on point here because Delgado was not convicted and is not in prison. But, as will become clear, the underlying principles of *Heck* were central to the Court's decision in *McDonough* and thus are at play here too.

In *Wallace*, a teenage boy was convicted of murder and sentenced to prison. 549 U.S. at 386. His conviction was ultimately overturned on appeal, and prosecutors dropped the charges instead of retrying him. *Id.* at 387. Upon his release from prison nearly a decade after he was first

charged, he filed a section 1983 suit seeking damages from, *inter alia*, his alleged unlawful arrest. *Id.*  The lower courts held his false-arrest claim was barred by the statute of limitations, and the Supreme Court granted certiorari to address when the statute of limitations began running for this claim.  *Id.*  To answer this question, the Court analogized the petitioner's false-arrest claim to the common-law tort of false imprisonment.  *Id.* at 388-89.  False imprisonment deals with "detention without legal process," and thus ends "once the victim becomes held pursuant to such process— when, for example, he is bound over by a magistrate or arraigned on charges."  *Id.* at 389.  Once this occurs, any unlawful detention might be relevant for the separate tort of malicious prosecution, which deals with "wrongful institution of *legal* process," but the false imprisonment is over.  *Id.* at 390 (emphasis altered).  Therefore, the Court held that the statute of limitations for the petitioner's section 1983 false arrest claim "commenced to run when he appeared before the examining magistrate and was bound over for trial" because at that point, his false arrest was over.  *Id.* at 391. His false arrest claim was thus time barred.  *Id.*

In line with the Court's approach in *Wallace*, the Court in *McDonough* looked to "common-law tort principles" to determine the accrual date for a fabricated-evidence claim.  139 S. Ct. at 2155 (quoting *Wallace*, 549 U.S. at 388).  The Court identified malicious prosecution as the "most analogous common-law tort."  *Id.* at 2156.  One substantive element of malicious prosecution is "termination of the prior criminal proceeding in favor of the accused."  *Heck*, 512 U.S. at 484.  This "favorable-termination requirement is rooted in pragmatic concerns with avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments."  *McDonough*, 139 S. Ct. at 2157.  Without this requirement, a convicted criminal defendant could pursue a malicious prosecution claim, which would "permit a collateral attack on the conviction through the vehicle of a civil suit."  *Heck*, 512 U.S. at 484 (internal

quotation marks omitted).  It thus "avoids allowing collateral attacks on criminal judgments through civil litigation." *McDonough*, 139 S. Ct. at 2157 (citing *Heck*, 512 U.S. at 484).  The Court drew on *Heck* to reach its conclusion that the petitioner "could not bring his fabricated-evidence claim under § 1983 prior to favorable termination of his prosecution." *Id.* at 2156.

But what about *Wallace*?  Although the Court there held that the accrual period began when the petitioner was bound over for trial, the Court made clear that he could have brought his claim at an *earlier* time—*i.e.*, when he was still in police custody and before he was presented to the magistrate judge. *Wallace*, 549 U.S. at 390 n.3 ("While the statute of limitations did not begin to run until petitioner became detained pursuant to legal process, he was injured and suffered damages at the moment of his arrest, and was entitled to bring suit at that time.").  This captures Delgado's main argument.  He says that reading *McDonough* to mean that favorable termination is a substantive element (rather than just the accrual date) is incorrect. *See* Opposition at 18.  In other words, Delgado points out that the accrual date in *Wallace*—when the petitioner was bound over— was not a substantive element of the petitioner's false arrest claim because he could have "filed suit immediately upon his false arrest." *Id.* (quoting *Wallace*, 549 U.S. at 390 n.3).

True enough.  But what Delgado fails to see is that the common-law tort at issue in *Wallace*—false imprisonment—is fundamentally different than malicious prosecution and, by analogy, a fabricated-evidence claim.  Indeed, *Wallace* noted "the common law's distinctive treatment of the torts of false arrest and false imprisonment." 549 U.S. at 388.  As the Supreme Court explained in *McDonough*, a false-arrest claim "has a life independent of an ongoing trial or putative future conviction—it attacks the arrest only to the extent it was without legal process, even if legal process later commences." 139 S. Ct. at 2159.  In other words, whether a victim of false arrest is ultimately prosecuted or convicted is beside the point.  But a fabricated-evidence claim,

25

like malicious prosecution, "centers on evidence used to secure an indictment" and "directly challenges—and thus necessarily threatens to impugn—the prosecution itself." *Id.*

To put it in simpler terms, the idea that a plaintiff could be awarded money damages for a fabricated-evidence claim that alleges a deprivation of liberty when the underlying criminal prosecution did not end in his favor would make little sense. "The proper approach in our federal system generally is for a criminal defendant who believes that the criminal proceedings against him rest on knowingly fabricated evidence to defend himself at trial and, if necessary, then to attack any resulting conviction through collateral review proceedings." *Id.* This must happen before seeking civil relief based on allegedly fabricated evidence. Consider for a moment, the alternative. Say Delgado had proceeded to trial and been convicted of all charges. While imprisoned, he wished to bring a fabricated-evidence claim, still believing that the police officers gave false accounts to the prosecutors and alleging that the officers' conduct resulted in a deprivation of his liberty. Such a claim would certainly be barred because it would be a challenge to "the validity of the criminal proceedings against him in essentially the same manner as the plaintiff in *Heck* challenged the validity of his conviction." *Id.* at 2158. In other words, a judgment in Delgado's favor on such a fabricated-evidence claim would "necessarily imply the invalidity of his conviction or sentence." *Heck*, 512 U.S. at 487. And civil damage suits are not the vehicle for such challenges.

General accrual principles add further support to this conclusion. "[T]he time at which a § 1983 claim accrues 'is a question of federal law,' 'conforming in general to common-law tort principles.'" *McDonough*, 139 S. Ct. at 2155 (quoting *Wallace*, 549 U.S. at 388). "That time is presumptively 'when the plaintiff has a complete and present cause of action.'" *Id.* (quoting *Wallace*, 549 U.S. at 388); *see also Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 201 (1997). When is an action "complete and present" for accrual

26

purposes?  "In the absence of legislative definition, courts construe accrual to be effective when all the elements necessary to an action have occurred, thereby enabling a suit to be maintained."  1 Calvin W. Corman, Limitations of Actions § 7.4.1, at 525-26 (1991) (footnote omitted); *see also Bay Area Laundry*, 522 U.S. at 201 ("Unless Congress has [said] otherwise in the legislation at issue, a cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief.").  Thus, "[u]nder the traditional rule of accrual . . . the tort cause of action accrues, and the statute of limitations commences to run, when the wrongful act or omission results in damages."  *Wallace*, 549 U.S. at 391 (quoting Corman, *supra*, § 7.4.1, at 526); *accord Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015).[5]

Consider again that, under *McDonough*, a plaintiff does not have a "complete and present cause of action" for the type of fabricated-evidence claim at issue here until "the criminal proceedings . . . terminated in his favor."  139 S. Ct. at 2155 (internal quotation marks omitted).  It therefore follows that favorable termination is also the moment when "all the elements necessary to [the] action have occurred."  Corman, *supra*, § 7.4.1, at 526.  Put differently, the alleged "wrongful act" does not "result[] in damages" until the underlying criminal proceedings terminate in the plaintiff's favor.  *Smith*, 782 F.3d at 100 (quoting *Wallace*, 549 U.S. at 391).  It is antithetical to the accrual principles just discussed to conclude otherwise.

And again, the fact that false arrest is treated differently is a nonstarter.  *Wallace* is the exception to the traditional rule of accrual because in some instances, "a particular claim may not

---

[5] The Second Circuit has added one additional gloss on accrual for section 1983 actions, which is that "accrual occurs when the plaintiff knows or has reason to know of the injury which is the basis of his action."  *Hogan*, 738 F.3d at 518 (quoting *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002)); *see also* Corman, *supra*, § 6.5.3, at 426 (explaining that because a plaintiff "may not know of the civil rights violation under § 1983 at the time it occurs . . . the plaintiff's claim does not accrue . . . until knowledge is acquired of both the wrong and the party committing it").  There is no dispute here regarding when Delgado learned of his alleged injuries.

realistically be brought while a violation is ongoing." *McDonough*, 139 S. Ct. at 2155 (citing *Wallace*, 549 U.S. at 389). Unlike a claim for false arrest in which a plaintiff is "injured and suffer[s] damages at the moment of his arrest," *Wallace*, 549 U.S. at 390 n.3, it is difficult to see how a plaintiff alleging fabrication of evidence could file suit and win damages, *see id.* at 388, before the criminal proceedings terminate in his favor.

In sum, Delgado's fabricated-evidence claim "centers on evidence used to secure an indictment" and "directly challenges . . . the prosecution itself." *McDonough*, 139 S. Ct. at 2159. Because this claim does not have a "life independent" of Delgado's criminal prosecution, Delgado must show that the prosecution terminated in his favor. *Id.* The Court thus joins the majority of courts in this Circuit who have concluded that after *McDonough*, favorable termination is a requirement of a fair trial claim alleging a deprivation of liberty due to the use of fabricated evidence. *See, e.g.*, *Kayo*, 2021 WL 1226869, at *17 (reading "*McDonough* to make favorable termination an element of fair trial claims"); *Miller*, 436 F. Supp. 3d at 603-04 (concluding that the plaintiff's allegation of fabricated evidence "falls within *McDonough*'s holding, and, consequently, his fair trial claim has not accrued *unless* and until his criminal proceedings terminated in his favor" (emphasis added)).[6]

Having concluded that Delgado's fabricated-evidence claim requires that he show that his

---

[6] The fabricated-evidence claim at issue in *McDonough* "allege[d] a deprivation of liberty." 139 S. Ct. at 2155 n.2. Delgado alleges the same. He contends that Defendants' use of fabricated evidence "caused post-arraignment restrictions to be imposed on his liberty and freedom of movement." Am. Compl. ¶ 184; *see also id.* ¶¶ 38 (alleging that after his initial post-arrest detention, "Delgado was released on the condition that he personally appear in court on all subsequent return dates, which constitute[d] an unlawful restriction upon his liberty and overall freedom of movement"), 59 (same); 5/26/21 Tr. at 29-30. While the Supreme Court recognized that "[o]ne could imagine a fabricated-evidence claim that does not allege that the violation's consequence was a liberty deprivation occasioned by the criminal proceedings themselves" and that "the argument for adopting a favorable-termination requirement would be weaker in that context," *McDonough*, 139 S. Ct. at 2160, that is not this case here since Delgado's claim is on all fours with the one in *McDonough*.

underlying criminal proceedings terminated in his favor, the next question is whether Delgado's acceptance of an ACD for each of his charges constitutes a favorable termination.  If not, his fabricated-evidence claim may not proceed as a matter of law.

A creature of New York Criminal Procedure Law section 170.55, an ACD (which, again, stands for "Adjournment in Contemplation of Dismissal") "provides a less structured means of disposing of relatively minor charges on a non-merits adjudicatory basis." *Hollender v. Trump Vill. Coop., Inc.*, 58 N.Y.2d 420, 424 (1983) (internal quotation marks omitted).  Upon the agreement of the defendant, the prosecutor, and the court, an ACD may be entered, which commences a six-month period "during which the [defendant's] habitual behavior pattern can be tested by time." *Id.* After the six-month period ends, and assuming the defendant stays out of trouble, "the case will be dismissed as a matter of course unless, on application of the prosecutor, the court is convinced 'that dismissal of the accusatory instrument would not be in furtherance of justice.'" *Id.* (quoting N.Y. Crim. Proc. L. § 170.55 subdiv. 2); *see also Singleton v. City of New York*, 632 F.2d 185, 194 (2d Cir. 1980) ("The six-month hiatus between adjournment and dismissal is especially significant: It is a period of observation, during which time the defendant's behavior may be observed to determine whether the prosecutor's acquiescence in the adjournment was justified.").  The key point is that a resolution by ACD means that the defendant's guilt is never determined.  Instead, "in a subsequent civil litigation to which a finding of guilt or innocence of the charge is germane, adjournment in contemplation of dismissal, by reason of its *sui generis* character, will leave the question unanswered." *Hollender*, 58 N.Y.2d at 425.

With no binding Second Circuit precedent on point, the law "remains unsettled as to whether an ACD constitutes a favorable termination in the context of a fair trial claim based on fabrication of the evidence." *Daniels v. Taylor*, 443 F. Supp. 3d 471, 478 (S.D.N.Y. 2020).  However, in the

context of a malicious prosecution claim—what the Supreme Court labeled the "most analogous common-law tort" to a fabricated-evidence claim, *McDonough*, 139 S. Ct. at 2156—a plaintiff must show "that the underlying criminal proceeding ended in a manner that affirmatively indicates his innocence." *Lanning v. City of Glens Falls*, 908 F.3d 19, 22 (2d Cir. 2018). Therefore, acceptance of an ACD precludes a malicious prosecution claim "not because the defendant has admitted guilt, but because it is a bargained-for dismissal of the criminal case." *Rothstein v. Carriere*, 373 F.3d 275, 287 (2d Cir. 2004); *see also Singleton*, 632 F.2d at 193-94; *Miller*, 436 F. Supp. 3d at 604 ("It is uncontroverted in this circuit that acceptance of an ACD, because it is *not* a favorable disposition, precludes a malicious prosecution claim.").

   *McDonough* relied on the similarity between malicious prosecution claims and fabricated-evidence claims. Thus, after *McDonough*, the majority of courts in this Circuit to consider the issue have concluded that "the characterization of an ACD logically should be the same for both types of claims." *Kayo*, 2021 WL 1226869, at *18 (collecting cases); *see also Daniels*, 443 F. Supp. 3d at 479-80 ("In light of *McDonough*'s recognition that malicious prosecution is 'analogous' to a fair trial claim based on the fabrication of the evidence, the Court sees no reason why this principle would not apply with equal force to Plaintiff's fair trial claim. Accordingly, the Court holds that Plaintiff's acceptance of an ACD bars his fair trial claim."); *Corso v. Calle-Palomeque*, No. 17 Civ. 6096 (NRB), 2020 WL 2731969, at *8 (S.D.N.Y. May 26, 2020) ("[I]n light of *McDonough*, [the plaintiff's] acceptance of an ACD bars his fair trial claim."). The Court agrees. When "a criminal defendant has traded resolution of his culpability for peace, he may not bring a fair trial claim, the success of which would necessarily undermine the validity of a prosecution settled only by his acceptance of an ACD." *Miller*, 436 F. Supp. 3d at 606 (internal citation omitted). Resolution by ACD does not "affirmatively indicate[] [the plaintiff's] innocence," *Lanning*, 908 F.3d at 22,

because whether the plaintiff is guilty is never determined, *see Hollender*, 58 N.Y.2d at 424.

At least one court has disagreed and held that "the favorable termination requirement for fair trial claims (assuming there is one) is necessarily different and more expansive than the one for malicious prosecution claims." *Ross v. City of New York*, No. 17 Civ. 3505 (PKC), 2019 WL 4805147, at *8 (E.D.N.Y. Sept. 30, 2019). That court's apparent rationale for this conclusion was that malicious prosecution is rooted in the Fourth Amendment, whereas a fabricated-evidence claim is rooted elsewhere. *See id.* at *8 n.14. This Court fails to see why that distinction means that an ACD should be regarded a favorable termination in one context, but not another. The court in *Ross* also relied on pre-*McDonough* cases that were "based, in part, on the principle that favorable termination is not an element of a fair trial claim." *Id.* at *8.

The Court instead joins the majority view in this Circuit in holding that an ACD precludes a fair trial claim based on fabricated evidence due in large part to its close relationship to the common-law tort of malicious prosecution. Delgado here accepted an ACD to resolve each of the criminal charges stemming from his three arrests. Collins Decl., Exhs. H-J. Because he therefore cannot show that his underlying criminal proceedings terminated in his favor, a necessary element of a fabricated-evidence claim alleging deprivation of liberty post-*McDonough*, he has failed to plead a plausible fair trial claim. The Court thus grants Defendants' motion for judgment on the pleadings as to Delgado's fair trial claims and dismisses the Tenth and Eleventh Causes of Action.[7]

## C. Malicious Abuse of Process

Defendants also seek judgment on Delgado's claims for malicious abuse of process under

---

[7] Defendants also move for judgment on a state law malicious prosecution claim. Motion at 7-8. This is puzzling because the Amended Complaint does not include such a claim. When asked about this at oral argument, Delgado's counsel conceded that "the state law claim [for malicious prosecution] was left out." 5/26/21 Tr. at 7. Because Delgado did not bring this claim, the Court need not address this portion of Defendants' motion.

section 1983 and New York state law.  Under New York law, which the Court must look to for the

section 1983 claim as well, a plaintiff must show that the defendant "(1) employ[ed] regularly

issued legal process to compel performance or forbearance of some act (2) with intent to do harm

without excuse or justification, and (3) in order to obtain a collateral objective that is outside the

legitimate ends of process." *Savino v. City of New York*, 331 F.3d 63, 76-77 (2d Cir. 2003) (internal

quotation marks omitted).   "[I]t is not sufficient for a plaintiff to allege that the defendants were

seeking to retaliate against him by pursuing his arrest and prosecution.  Instead, he must claim that

they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Id.*

at 77.  "Examples of the types of collateral objectives covered by the tort of malicious abuse of

process include the infliction of economic harm, extortion, blackmail, and retribution." *Johnson v.*

*City of New York*, No. 15 Civ. 8195 (GHW), 2017 WL 2312924, at *18 (S.D.N.Y. May 26, 2017).

Defendants argue that Delgado fails to allege both the collateral objective and intent to do

harm elements of this claim.  Motion at 16-17.  As to the latter, the Amended Complaint alleges no

facts with respect to the Individual Defendants' intent, and Delgado offers no response to

Defendants' lack of intent argument.  The Court thus dismisses Delgado's malicious abuse of

process claims on this basis alone. *See Hardy v. City of New York*, No. 12 Civ. 17 (RJS), 2013 WL

5231459, at *3 (S.D.N.Y. July 9, 2013).

Delgado's response focuses only on the collateral objective element.  Opposition at 21.  For

this, he points to one paragraph of the Amended Complaint, which alleges that the Individual

Defendants "stopped him, searched his person, and then falsely arrested him, due solely to their

racial, ethnic, gender, or socio-economic discriminatory prejudices, their desire to meet an arrest

quota and to benefit from increased overtime compensation." Am. Compl. ¶ 95.  The Amended

Complaint pleads no facts to support any of these theories.  Nothing suggests Defendants were

motivated by some sort of animus, and it is unclear why Delgado believes the Individual Defendants had an "arrest quota" and were driven by "overtime compensation" (or why arresting him would mean they would receive overtime pay).  Delgado's conclusory allegations are simply not plausible.  *See Prasad v. City of New York*, No. 08 Civ. 3818 (PAC), 2009 WL 1119412, at *3 (S.D.N.Y. Apr. 24, 2009).  The Court therefore grants Defendants' motion for judgment on the pleadings for Delgado's malicious abuse of process claims and dismisses the Seventh and Eighth Causes of Action.

**D. Equal Protection**

The precise contours of Delgado's equal protection claims are far from clear.  At one point, he says that Defendants discriminated against him "solely due to [D]efendants' perception or consideration of [Delgado's] race, ethnicity, national origin, immigration status, religion, gender, socio-economic status or age."  Am. Compl. ¶ 98; *see also id.* ¶ 99-100.  And in other parts of the Amended Complaint, he omits his allegations with regard to immigration status, socio-economic status, and age, instead accusing Defendants of discriminating against him only "on the basis of his race, national origin, ethnicity, religion or sex."  *Id.* ¶¶ 189, 199.  All of this boiler-plate language[8] aside, it appears that Delgado's main theory is race-based discrimination.  *See id.* ¶ 101.  He says that Defendants either "engaged in the selective treatment of [Delgado] compared to others similarly situated," *id.* ¶ 190, *see also id.* ¶ 200, or "applied facially neutral statutes with adverse effects against [Delgado]" because they were "motivated by discriminatory animus," *id.* ¶ 193; *see also id.* ¶ 203.  *See also* Opposition at 23; 5/26/21 Tr. at 27 ("[Delgado] is proceeding on two

---

[8] A paradigmatic example of the Amended Complaint's boiler-plate language is that Delgado claims Defendants "perpetrated multiple overt acts in furtherance of their obviously discriminatory inclinations, namely *the unlawful car stop*, searches, assaults, batteries, seizure, arrest, and prosecution against [Delgado]."  Am. Compl. ¶ 99 (emphasis added).  The Individual Defendants did not stop Delgado in a car, but instead approached him in a subway station.  *Id.* ¶¶ 21, 40, 61.

different theories, the selective treatment theory and the racial animus theory.").

Delgado alleges equal protection violations under the Fourteenth Amendment to the United States Constitution, Am. Compl. ¶ 205, and under "New York State law," *see id.* ¶¶ 187-196.  The Court construes his state claim as one under the New York Constitution and analyzes the claims together.  *See Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill of Pomona, N.Y.*, 945 F.3d 83, 110 n.211 (2d Cir. 2019) ("The equal protection guarantees under the New York Constitution are coextensive with those under the U.S. Constitution.").

To establish an equal protection violation for selective treatment under section 1983, a plaintiff must show "(1) [that he], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  *Mangum v. City of New* York, No. 15 Civ. 8810 (PAE), 2016 WL 4619104, at *8 (S.D.N.Y. Sept. 2, 2016) (alteration in original) (quoting *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 234 (2d Cir. 2004)); *see Lanning*, 908 F.3d at 29 ("To state an equal protection claim based on a theory of selective enforcement, a plaintiff must plausibly allege, among other things, that he was treated differently from other similarly situated individuals.").

Delgado's effort to allege similarly situated individuals is found in a single paragraph of the Amended Complaint.  He contends that "[D]efendants did not stop any white individuals, who were acting in the same manner [as Delgado]" during each of the three incidents at issue.  Am. Compl. ¶ 101.  Such conclusory allegations are insufficient to plead an equal protection violation.  *See Demaitre v. City of New York*, No. 18 Civ. 12403 (PGG), 2020 WL 6048192, at *5 (S.D.N.Y. Oct. 11, 2020) (dismissing an equal protection claim when the plaintiff's only allegation was that the defendants did not arrest "Caucasian correction officers" for similar conduct); *Mangum*, 2016 WL

4619104, at *8 (dismissing an equal protection claim when the plaintiff's "only allegation" was that police officers stopped him "on account of his race"). "[I]t is not sufficient to 'conclusorily assert[] that the Defendants intentionally treated [a plaintiff] differently from others in a similar situation.'" *Demaitre*, 2020 WL 6048192, at *5 (quoting *Lanning*, 908 F.3d at 29).

The allegations here stand in contrast with those in *Hu v. City of New York*, 927 F.3d 81 (2d Cir. 2019). In *Hu*, the plaintiffs (an Asian construction worker and Asian-owned companies, *id.* at 86) alleged that a city inspector cited them "for having a pool of water" on a jobsite. *Id.* at 96. But when that same inspector returned to the location "when white workers were performing work on the jobsite" and "also working next to a pool of water," he did not ticket them. *Id.* The court said that the question of whether the plaintiffs' selective enforcement claims based on these facts were plausible was "a close one," but ultimately held that they should have survived the motion to dismiss. *Id.* at 99. The court noted that the plausibility of these claims was strengthened by the plaintiffs' specific allegations of the inspector's alleged racial bias against Asians, including "racist comments" he made and statistics showing that the inspector "gave more violations to Asian construction sites than did his colleagues." *Id.* In contrast to *Hu*, all Delgado has said in support of his selective enforcement theory is that there were unidentified white people in the same subway station "who were acting in the same manner" as him. Am. Compl. ¶ 101; *see also* 5/26/21 Tr. at 28 (arguing that Delgado "did make specific factual allegations that white individuals . . . were engaged in the same behavior as alleged in the [Amended Complaint], which was . . . maybe speaking to individuals inside of the subway or [the white individuals] happened to provide directions, and they were not stopped or arrested like [Delgado] was"). Permitting Delgado's equal protection claims to proceed on such threadbare allegations would gut the standard for plausibility articulated in *Iqbal* and would allow any equal protection claim based on an alleged false arrest to

proceed so long as a plaintiff alleges that nearby people of another race were also not falsely arrested at the same time. *See Iqbal*, 556 U.S. at 680 (explaining that a plaintiff must allege facts that "'nudg[e]' his claim of purposeful discrimination 'across the line from conceivable to plausible'" (alteration in original) (quoting *Twombly*, 550 U.S. at 570)).

Delgado's racial animus theory is similarly unavailing. The Amended Complaint is completely devoid of any non-conclusory factual allegations suggesting that Defendants harbored a racial animus against Delgado. *See, e.g.*, Am. Compl. ¶¶ 95 (alleging Defendants stopped, searched, and arrested Delgado "due solely to their racial, ethnic, gender, or socio-economic discriminatory prejudices"); 96 (alleging Defendants assumed that their "version of events would undoubtedly and unduly be credited over . . . Delgado's, solely because . . . Delgado is a Hispanic or African American male"); 97 (alleging Defendants arrested Delgado because he is "a Hispanic or African American male"); 98 (alleging Defendants arrested, assaulted, battered, and prosecuted Delgado "solely due to [D]efendants' perception or consideration of [Delgado's] race, ethnicity, national origin, immigration status, religion, gender, socio-economic status or age"). Bald assertions like these are implausible. *See, e.g.*, *Demaitre*, 2020 WL 6048192, at *5; *Bonifacio v. United States*, No. 16 Civ. 8379 (AJN), 2020 WL 5801475, at *6 (S.D.N.Y. Sept. 28, 2020); *Velasquez v. City of New York Dep't of Bldgs.*, No. 19 Civ. 9687 (PKC), 2020 WL 2614826, at *4 (S.D.N.Y. May 22, 2020).

Further, "it is well established that '[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.'" *Drew v. City of New York*, No. 18 Civ. 10557 (JMF), 2020 WL 3869732, at *3 (S.D.N.Y. July 9, 2020) (alteration in original) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). The Amended Complaint pleads no facts regarding Defendants' intent.

The Court thus grants Defendants' motion with regard to Delgado's equal protection claims and dismisses the Twelfth and Thirteenth Causes of Action.

**E.  Conspiracy to Interfere with Civil Rights**

To plead a claim of conspiracy to interfere with civil rights pursuant to 42 U.S.C. § 1985, "the Complaint 'must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.'"  *Sun v. N.Y.C. Police Dep't*, No 18 Civ. 11002 (LTS), 2020 WL 4530354, at *8 (S.D.N.Y. Aug. 6, 2020) (quoting *Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003)).  "It is well settled that claims of conspiracy 'containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.'"  *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (quoting *Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir. 1993)).

Defendants argue that Delgado's section 1985 conspiracy claim must fail under the intracorporate conspiracy doctrine.  Motion at 14-15.  This doctrine provides that "officers, agents, and employees of a single corporate entity are legally incapable of conspiring together."  *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008) (internal quotation marks omitted).  Because Delgado alleges that the conspiracy was entirely among NYPD officers, his section 1985 claim is therefore barred.  *See Sun*, 2020 WL 4530354, at *8.

Delgado also brings a conspiracy claim under section 1983.  *See* Am. Compl. ¶¶ 207-213. The Second Circuit has yet to decide whether the intracorporate conspiracy doctrine applies to conspiracy claims under section 1983.  *See Zilioli v. City of New York*, No. 17 Civ. 9495 (WHP), 2020 WL 1548763, at *4 (S.D.N.Y. Apr. 1, 2020).  "Nonetheless, district courts have typically applied the logic of the intracorporate conspiracy doctrine to § 1983 claims."  *Id.*; *accord Anemone v. Metro. Transp. Auth.*, 419 F. Supp. 2d 602, 604 (S.D.N.Y. 2006).  The Court is persuaded that

this doctrine bars Delgado's conspiracy claim pursuant to section 1983 too.  A claim under section 1983 requires a showing of "an agreement between two or more state actors or between a state actor and a private entity."  *Zilioli*, 2020 WL 1548763, at *4 (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)).  This "cannot be satisfied where all of the alleged conspirators are employees of a single entity and acting within the scope of their employment as agents of that entity."  *Anemone*, 419 F. Supp. 2d at 604.

Delgado's reliance on the "personal stake exception" to the intracorporate conspiracy doctrine fails.  *See* Opposition at 20.  This exception says that the intracorporate conspiracy doctrine does not prevent claims against "individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity."  *Ali v. Connick*, 136 F. Supp. 3d 270, 282 (E.D.N.Y. 2015) (internal quotation marks omitted).  "In order for the exception to apply, '[t]he plaintiff must also allege that [the defendants] acted other than in the normal course of their corporate duties.'"  *Id.* at 283 (alterations in original) (quoting *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 72 (2d Cir. 1976)).

Delgado finds no help from this exception because the Amended Complaint does not even plausibly allege a conspiracy, let alone that the Individual Defendants conspired to pursue personal interests separate and apart from their NYPD duties.  He alleges that Defendants "engaged in a conspiracy against [him] to deprive [him] of the equal protection of the laws, or of the privileges and immunities under the laws."  Am. Compl. ¶ 208.  And he says that the conspiracy was "motivated by some racial, or otherwise class-based, invidious discriminatory animus."  *Id.* ¶ 211. The closest Delgado gets to alleging facts supporting the application of this exception is in one paragraph of the Amended Complaint in which he alleges that the Individual Defendants were motivated by a "desire to meet an arrest quota and to benefit from increased overtime

38

compensation." *Id.* ¶ 95.  A court in this District determined that the personal stake exception applied in a case involving allegations that officers "sought to improve their arrest records in order to secure promotions and other benefits" by routinely arresting innocent subway riders and "made racist remarks while arresting them." *Yeadon v. N.Y.C. Transit Auth.*, 719 F. Supp. 204, 207 (S.D.N.Y. 1989).  In contrast, Delgado's naked assertions and conclusory allegations are the kind that cannot survive a motion to dismiss.  *See Gallop*, 642 F.3d at 369 (affirming the district court's dismissal of a plaintiff's conspiracy claims when she failed to offer "a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators").  The Court therefore grants Defendants' motion with regard to Delgado's conspiracy claims.  Accordingly, Delgado's claim under section 1986 for failure to prevent a conspiracy cannot survive either.  *Graham v. Henderson*, 89 F.3d 75, 82 (2d Cir. 1996) ("[A] § 1986 claim is contingent on a valid § 1985 claim.").  The Court therefore dismisses the Fourteenth Cause of Action.

## F.  Intentional and Negligent Infliction of Emotional Distress

Finally, Delgado brings claims for intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED").  Am. Compl. ¶¶ 168-175.  Defendants moved for judgment on these claims, Motion at 18-19, but Delgado did not respond to any of Defendants' arguments, which Delgado's counsel recognized at oral argument.  5/26/21 Tr. at 9-10.  Therefore, the Court deems these arguments abandoned.  *See Arma v. Buyseasons, Inc.*, 591 F. Supp. 2d 637, 642-43 (S.D.N.Y. 2008) (collecting cases).

Even if the Court were to consider these claims on the merits, they would fail.  "Federal courts in the Second Circuit agree that no [IIED] claim will lie where the conduct underlying the claim falls within the ambit of traditional tort liability." *Pateman v. City of White Plains*, No. 17 Civ. 6156 (KMK), 2020 WL 1497054, at *25 (S.D.N.Y. Mar. 25, 2020) (alteration in original)

(internal quotation marks omitted).  Thus, "courts have not hesitated to dismiss IIED claims where 'the alleged conduct fits well within the traditional tort theories of false arrest, malicious prosecution, and assault and battery.'"  *Id.* (quoting *Zhao v. City of New York*, 656 F. Supp. 2d 375, 405 (S.D.N.Y. 2009)).  The same is true for Delgado's NIED claim.  *See DeVito v. Barrant*, No. 03 Civ. 1927 (DLI), 2005 WL 2033722, at *9 (E.D.N.Y. 2005); *Moore v. City of New York*, 219 F. Supp. 2d 335, 339 (E.D.N.Y. 2002) ("The New York Court of Appeals has strongly cautioned against allowing emotional distress claims to be brought where other tort remedies are available.").  Delgado's IIED and NIED claims are based on the same alleged conduct that forms the basis for Delgado's other tort claims, such as false arrest and malicious abuse of process.  Accordingly, even if Delgado had not abandoned his IIED and NIED claims, the Court would still grant Defendants' motion with regard these claims.  The Court therefore dismisses the Ninth Cause of Action.

*     *     *

In sum, the Court grants Defendants' motion as to the following claims: intentional and negligent infliction of emotional distress (Ninth Cause of Action) and denial of the right to a fair trial based on a theory of fabricated evidence (Tenth and Eleventh Causes of Action), which are all dismissed with prejudice.  The Court also grants Defendants' motion without prejudice as to the following claims, which were insufficiently pleaded: malicious abuse of process (Seventh and Eighth Causes of Action), deprivation of rights and denial of equal protection of the laws (Twelfth and Thirteenth Causes of Action), and conspiracy and failure to prevent conspiracy (Fourteenth Cause of Action).  The Court denies Defendants' motion with regard to Delgado's false arrest and false imprisonment claims (Third and Fourth Causes of Action) and failure to intervene claims (Fifteenth and Sixteenth Causes of Action).  Thus, the following claims will proceed: the First through Fifth and Fifteenth through Eighteenth Causes of Action.

### IV.  Conclusion

For the reasons stated, the Court grants in part and denies in part Defendants' motion for judgment on the pleadings.  Within two weeks of the filing of this Opinion and Order, Delgado shall file a letter explaining whether he seeks leave to file a second amended complaint in order to correct the pleading deficiencies with regard to the Seventh, Eighth, Twelfth, Thirteenth, and Fourteenth Causes of Action.  By that date, the parties shall also submit a proposed case management plan and scheduling order.

SO ORDERED.

Dated: June 17, 2021
       New York, New York

JOHN P. CRONAN
United States District Judge