UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PETER DELGADO,

                                    Plaintiff,

                        -v.-

CITY OF NEW YORK, individually and in
their official capacities as New York City
police officers, MD SAMSUDDIN, WILFRED
MARTINEZ, KYLE TING, LUIS
RODRIGUEZ,

                                    Defendants.

---

19 Civ. 6320 (JHR)

OPINION & ORDER

JENNIFER H. REARDEN, District Judge:

Plaintiff Peter Delgado brings this action, pursuant to 42 U.S.C. § 1983 and New York law,

against New York City ("City") and New York City Police Department ("NYPD") Officers Md

Samsuddin ("Officer Samsuddin"), Wilfred Martinez ("Officer Martinez"), Kyle Ting ("Officer

Ting"), and Luis Rodriguez ("Sergeant Rodriguez") (collectively, "Defendants"), alleging that

Defendants, *inter alia*, unlawfully arrested him in violation of the Fourth Amendment of the U.S.

Constitution.  *See* ECF No. 14 (Am. Compl.).  Before the Court is Defendants' motion for

summary judgment pursuant to Federal Rule of Civil Procedure 56 as to Plaintiff's federal and

state claims for false arrest and false imprisonment, unlawful search and seizure, and failure to

intervene; municipal "*Monell*" liability under 42 U.S.C. § 1983, *see Monell v. Dep't of Soc. Srvs.

of N.Y.C.*, 436 U.S. 658 (1978); and state claims for assault and battery and negligent hiring,

retention and supervision.  *See* ECF No. 99; ECF No. 101 (Defs.' Br.).

For the reasons set forth below, Defendants' motion is GRANTED with respect to

Plaintiff's federal and state claims for false arrest and false imprisonment, unlawful search and

seizure, and failure to intervene, and Plaintiff's municipal *Monell* liability claim.  The Court

declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, which are DISMISSED without prejudice.

## I.     BACKGROUND

### A.  Factual Background[1]

The instant action stems from three separate arrests of Plaintiff, on April 23, May 4, and September 22, 2018.  Unless otherwise noted, the following facts are undisputed.

### 1.  The April 23, 2018 Arrest

On April 23, 2018, [Plaintiff] entered the subway station at 49th Street and 7th Avenue in Manhattan.  Defs.' 56.1 ¶ 1; Pl.'s Counter 56.1 ¶ 1.  Plaintiff went to that subway station "because it is popular with tourists."   Defs.' 56.1 ¶ 2; Pl.'s Counter 56.1 ¶ 2.   Over the course of "approximately ten[ ] minutes," Officer Samsuddin, who was on the northbound platform, observed Plaintiff, who was on the southbound side, speak with more than ten tourists.  Defs.' 56.1 ¶ 4; Pl.'s Counter 56.1 ¶ 4; Pl.'s 56.1 ¶ 11; Defs.' Counter 56.1 ¶ 11; Ex. 2 (Samsuddin Dep.) at

---

[1] The factual background is drawn from the parties' statements and counterstatements pursuant to Local Civil Rule 56.1, *see* ECF No. 97 (Defs.' 56.1), ECF No. 112 (Pl.'s Counter 56.1), ECF No. 113 (Pl.'s 56.1), ECF No. 120 (Defs.' Counter 56.1); the Declaration of Jeffrey F. Frank in support of Defendants' motion for summary judgment, *see* ECF No. 100 (Frank Decl.), and accompanying Exhibits A through J, including video files submitted to the Court that correspond with Exhibits C, F, and I depicting body camera ("body cam") footage of each of Plaintiff's arrests; and the Declaration of Ataur Raquib in support of Plaintiff's opposition to Defendants' motion, *see* ECF No. 114 (Raquib Decl.) and accompanying Exhibits 1 through 6.  The Court considers the body cam footage submitted as Exhibits C, F, and I to the Frank Declaration "reliable objective evidence" upon which the Court may rely and which "may speak for itself." *Marcavage v. City of New York*, 689 F.3d 98, 110 (2d Cir. 2012); *see Scott v. Harris*, 550 U.S. 372, 380-81 (2007).  To the extent that factual information is clearly confirmed by video footage, the Court will consider such facts undisputed.  *See Sherrard v. City of New York*, No. 14 Civ. 9321 (NRB), 2016 WL 7489069, at *1 n.1 (S.D.N.Y. Dec. 22, 2016).

Tr. 43:16-22.[2]  Some of the tourists Plaintiff spoke with during this time "handed [P]laintiff money before entering the subway system."  Defs.' 56.1 ¶¶ 4-5; Pl.'s Counter 56.1 ¶¶ 4-5.

Officer Samsuddin testified during his June 2, 2022 deposition that "he and other officers patrol the subway stations, while uniformed or in plain clothes, to protect people from being scammed," and that "scammers [will] . . . jam the MetroCard vending machines so tourists and other individuals [will] then rely on scammers positioned at turnstiles to be swiped into the subway system in exchange for cash" or to "sell" them a "MetroCard."  Pl.'s 56.1 ¶¶ 4, 7; Defs.' Counter 56.1 ¶¶ 4, 7; Samsuddin Dep. Tr. 22:14-24:24, 53:4-56:12.  Officer Samsuddin also stated that, while he was in training and on patrol, he learned about scams in the subway system, including those committed against tourists.  Samsuddin Dep. Tr. 20:5-24:24, 52:17-56:12.  He explained, for example, that tourists are not "accustomed" to the subway, and that scammers may talk to them and offer to "help" but then take their money and "run away."  *Id.* at Tr. 22:14-24:7; *see id.* at Tr. 54:14-56:12.

Officer Samsuddin further testified that when officers "are walking around in plainclothes," it gives them a "better advantage to overhear conversation or actually observe [the] behavior" of "any suspect who is involved in the scam . . . and to identify them."  *Id.* at Tr. 24:8-25:20.  He stated that, "[w]hen people come and go, [the police] don't really observe them, but if

---

[2] The parties dispute whether Officer Samsuddin's vision was obscured, casting doubt on his "observations."  Pl.'s Counter 56.1 ¶ 6 (refuting Defendants' statement that "[Officer] Samsuddin observed . . . [a] transaction between [P]laintiff and a female subway passenger," because "[Officer] Samsuddin was over forty (40) feet away when he observed this transaction and his vision was obscured by a revolving door, undermining the accuracy of his observations"); Pl.'s 56.1 ¶ 11 ("[Officer] Samsuddin observed Plaintiff speak with . . . individuals from over forty (40) feet away on the northbound platform with trains passing by between them and a metal revolving door obscuring his vision of Plaintiff."); Defs.' Counter 56.1 ¶ 11 (disputing Plaintiff's "unsupported assertion that [Officer] Samsuddin's vision of [P]laintiff's conduct was obscured").  The Court's conclusion regarding these contentions is set forth in Section III.A.1, *infra*.

somebody is do[ing] something unusual," the police ask questions and "start looking at the people." *Id.* at Tr. 43:2-11.  Officer Samsuddin also stated that "standing at a turnstile while asking for swipes to enter the subway and also swiping for someone in exchange for money" are "violations."  Pl.'s 56.1 ¶ 2; Defs.' Counter 56.1 ¶ 2; Samsuddin Dep. Tr. 60:10-61:17.

"Based on his observations" of Plaintiff on April 23, 2018, Officer Samsuddin believed that Plaintiff had "'sold a swipe' to [a] female subway passenger"— "in other words, that Plaintiff had allowed the female passenger to enter the subway system in exchange for money." Defs.' 56.1 ¶ 7; Pl.'s Counter 56.1 ¶ 7.  In addition, Officer Samsuddin testified that he "watched Plaintiff swipe some individuals into the subway system" and "observed Plaintiff" "manipulate two MetroCards, use them to swipe people in, and then place them in a metal box above the revolving metal door."  Pl.'s 56.1 ¶¶ 13, 14; Defs.' Counter 56.1 ¶¶ 13, 14.  "[Officer] Samsuddin . . . explained that scammers . . . manipulate MetroCards by bending them," "which allows the MetroCard to be used at a turnstile even if [it is] not preloaded with money for subway fare," and that this is a "charge[able]" offense.  Pl.'s 56.1 ¶¶ 5, 9; Defs.' Counter 56.1 ¶¶ 5, 9; Samsuddin Dep. Tr. 65:22-67:6, 68:13-:18, 69:12-70:8.

Officer Samsuddin waited until he visually observed an exchange of cash between Plaintiff and the female passenger before he communicated to non-parties Sergeant Rios Kelly and Officer Nunez that there was an exchange of cash.  Pl.'s 56.1 ¶¶ 13, 16; Defs.' Counter 56.1 ¶¶ 13, 16; Ex. C (footage from body cam worn by Officer Samsuddin during April 23, 2018 arrest) at 0:49-0:54 (identifying one of the officers as Officer Nunez); Ex. D (listing Officer Kelly as the "Supervisor Approving" officer).  Sergeant Kelly and Officer Nunez then arrested Plaintiff and put him in handcuffs.  Pl.'s 56.1 ¶¶ 16, 17; Defs.' Counter 56.1 ¶¶ 16, 17.[3]  After being placed under arrest,

---

[3] Officer Nunez's first name is not apparent from the record.

Plaintiff stated that he was "panhandling." Ex. C at 0:54:-0:56. Plaintiff told officers that he was "trying to make an honest dollar" and that his goal was to make "like sixty dollars" that day. *Id.* at 2:58-3:06, 7:50-7:58. Plaintiff also told officers that he was "not selling no swipes," but shortly thereafter, he stated that he was "selling swipes"—and that he was there to help people "if they need a swipe." *Id.* at 3:25-3:30, 4:12-4:18, 6:33-6:38. Plaintiff further stated that he was there to "help people with directions." *Id.* at 4:03-4:06.

Approximately thirty minutes after Plaintiff was taken to the Transit District Precinct, where he was detained prior to his transfer to Central Booking, Officer Samsuddin returned to the subway station to "recover [ ] two MetroCards." Pl.'s 56.1 ¶¶ 19-21; Defs.' Counter 56.1 ¶¶ 19-21. The parties dispute, however, whether the MetroCards recovered were the same cards Officer Samsuddin stated he had seen Plaintiff using prior to his arrest. *See* Defs.' Counter 56.1 ¶¶ 19-20 (disputing Plaintiff's characterization at Pl.'s 56.1 ¶ 19 of "alleged" MetroCards used by Plaintiff, and disputing Pl.'s 56.1 ¶ 20 "as misleading to the extent that the statement implies that the two MetroCards . . . could have belonged to another scammer").

Plaintiff's April 23, 2018 arrest report asserts that Plaintiff was arrested for forgery in the second degree of public transportation tokens in violation of New York Penal Law § 170.10(4), unauthorized sale of a farecard in violation of New York Penal Law § 165.16, and loitering in violation of New York Penal Law § 240.35(6). Ex. D. The criminal complaint charged Plaintiff with "Criminal Possession of a Forged Instrument in the Third Degree" in violation of New York Penal Law § 170.20 and "Unauthorized Sale of Certain Transportation Services" in violation of New York Penal Law § 165.16(1). Ex. 4. On February 28, 2019, Plaintiff accepted an adjournment in contemplation of dismissal for all criminal charges stemming from this arrest, along with the charges from his arrests on May 4 and September 22, 2018, addressed *infra*. Defs.' 56.1 ¶ 36; Pl.'s Counter 56.1 ¶ 36; *see* Ex. J.

**2.  The May 4, 2018 Arrest**

On May 4, 2018, Plaintiff returned to the same subway station at 49th Street and 7th Avenue.  Defs.' 56.1 ¶ 17; Pl.'s Counter 56.1 ¶ 17.  Plaintiff spoke with more than ten tourists, some of whom "handed [P]laintiff money before entering the subway system."  Defs.' 56.1 ¶¶ 18, 19; Pl.'s Counter 56.1 ¶¶ 18, 19.  Officer Ting informed Officers Martinez and Sergeant Rodriguez of his observations, and the officers arrested Plaintiff and another individual.  Pl.'s 56.1 ¶ 27; Defs.' Counter 56.1 ¶ 27; Ex. F (footage from body cam worn by Officer Martinez during May 4, 2018 arrest) at 4:12-4:15 (depicting Sergeant Rodriguez); Ex. 3 (Ting Dep.) at Tr. 43:3-18 (identifying Sergeant Rodriguez in body cam footage); Ex. 5.

According to Officer Martinez's statements under penalty of perjury in the May 4, 2018 criminal complaint, Plaintiff "approached Officer Ting" and "stated to him in substance," "Do you need a ride? I can get you on?" Ex. 5.  Officer Martinez attests that "Officer Ting stated to [Plaintiff] that he only had a $20.00 dollar bill to pay for a swipe into the transit system," and that Plaintiff stated, in "substance," "No problem."  *Id.*  Officer Martinez was "further informed that Officer Ting then observed [Plaintiff] thumbing through U.S. currency in his hands to make change for Officer Ting."  *Id.*  The May 4, 2018 arrest record lists Officer Martinez as the Arresting Officer and Sergeant Rodriguez as the Supervisor Approving officer but does not mention Officer Ting.  Ex. E.  The arrest record avers that Plaintiff "ATTEMPTED TO SELL AN ENTRY/RIDE TO A PLAINCLOTHES POLICE OFFICER."  *Id.*  There is no dispute that Officer Ting was in plain clothes at around the time of Plaintiff's arrest.  Pl.'s 56.1 ¶ 27; Defs.' Counter 56.1 ¶ 27.

At his June 2, 2022 deposition, Officer Ting testified that he had "[v]ery little" recollection of Plaintiff's May 4, 2018 arrest.  Ting Dep. Tr. 30:12-15.  He testified that he didn't "remember" "observ[ing] [Plaintiff] engag[ing] in some criminal conduct."  *Id.* at Tr. 32:5-8.  Later in his deposition, he was asked, "[A]s you sit here today, based on your own personal recollection, you

can't speak to any conduct—criminal conduct by [Plaintiff] because you just didn't observe it?" *Id.* at Tr. 42:3-7.  In response, Officer Ting testified that he "didn't observe him committing the crime that day . . . So, I can't speak for it, yes." *Id.* at Tr. 42:8-10.

Officer Ting recalled that the arrest took place at "the mezzanine by the southbound side" of the 49th Street and 7th Avenue station, that Plaintiff and "another swiper" were "arrested at the same time," and that Plaintiff was arrested for "[s]elling swipes." *Id.* at Tr. 31:8-18, 38:3-6, 39:4-7.  Officer Ting explained that the "crime or violation of selling swipes," "in general," can be achieved by "bend[ing] or alter[ing] the magnetic strip of the MetroCard . . . allow[ing] . . . access [to] the transit system" or by "propp[ing] an object whether it be tape or cardboard in between the magnetic strip of the emergency door, and using those two methods to self-swipes [sic]—sell fares in exchange—to tourist[s] or anyone." *Id.* at Tr. 39:8-19; *see* Pl.'s 56.1 ¶ 6; Defs.' Counter 56.1 ¶ 6.  Officer Ting further testified that, "[f]or the crime of selling swipe[s]," the police would have "observe[d] [perpetrators] committing the crime in exchange for US coins" before making an arrest.  Ting Dep. Tr. 50:21-52:9.

Officer Ting recounted that he "believe[d] [he] was on the northbound side of the train station and . . . was watching the 47th Street mezzanine entrance" on the "southbound side" of the station.  *Id.* at Tr. 34:13-35:10.  He said that he "didn't witness the arrest, but [he] remember[s] crossing the street coming down [to the opposite, southbound platform] and then Officer Martinez and Sergeant Rodriguez already had [Plaintiff] and another perpetrator under arrest."  *Id.* at Tr. 34:13-35:4, 36:4-18.  Officer Ting testified that he then "assisted with the arrest," including by "help[ing] secure" the perpetrators.  *Id.* at Tr. 37:4-16; *see* Ex. F.

Plaintiff does not dispute that, prior to his arrest, someone "asked if he had change for a twenty [ ] dollar bill."  Pl.'s 56.1 ¶¶ 23-24.  He does not concede, however, that the individual with whom he spoke was Officer Ting.  *See id.* ¶ 23.  Instead, Plaintiff asserts that this person is an

"unknown individual." *Id.* ("At one point, an unknown individual approached Plaintiff and asked if he had change for a twenty (20) dollar bill.").[4]  Per the body cam footage, after Plaintiff was placed in handcuffs, and while he was under arrest, he stated that he "thought he needed change because he wanted . . . he said he had a MetroCard that he couldn't . . . [indecipherable] help with the machine . . . So he said if I got change for a 20, and I said yeah, I got change for a 20."  Ex. F at 0:07-0:34.  Someone off camera, in the direction of Officer Ting said "little more than that," to which Plaintiff responded, "I know . . . I panhandle down here, that's all I do down here . . . I don't swipe."  *Id.* at 0:35-48.  Plaintiff repeated "I panhandle down here" and stated that "there's a lot of tourists."  *Id.* at 0:56-1:07.

Thereafter, Plaintiff was detained at the Transit District Precinct and then Central Booking before his release from physical custody after his criminal court arraignment.  Pl.'s 56.1 ¶ 30; Defs.' Counter 56.1 ¶ 30.  The criminal complaint charged Plaintiff with Possession of Burglar's Tools in violation of New York Penal Law § 140.35, Criminal Possession of a Forged Instrument in the Third Degree in violation of New York Penal Law § 170.20, Unlawful Sale or Reproduction of a MetroCard in violation of 21 N.Y.C.R.R. § 1050.4(c), and Loitering in violation of New York Penal Law § 240.35(6).  Ex. 5.

### 3.  The September 22, 2018 Arrest

On September 22, 2018, Plaintiff returned to the same subway station at 49th Street and 7th Avenue.  Defs.' 56.1 ¶ 25; Pl.'s Counter 56.1 ¶ 25.  After he arrived, Plaintiff stood near the map of the subway station and spoke with at least ten tourists, "[s]ome of [whom] handed [him] money before entering the subway system."  Pl.'s 56.1 ¶ 31; Defs.' Counter 56.1 ¶ 31; Defs.' 56.1

---

[4] At some points during his May 18, 2022 deposition, Plaintiff asserted that the other individual who was arrested had "said he needed a METRO card or some change or something like that" and had asked someone for change.  *See, e.g.*, Ex. 1 (Pl.'s Dep.) at Tr. 161:7-:13 (testifying about body cam footage).

¶¶ 27-28; Pl.'s Counter 56.1 ¶¶ 27-28.  Officer Ting watched Plaintiff for approximately fifteen minutes from the northbound platform, which he testified was approximately "more than 60" but "less than a hundred" feet from Plaintiff's location on the "[s]outhbound mezzanine."  Pl.'s 56.1 ¶ 34; Defs.' Counter 56.1 ¶ 34; Ting Dep. Tr. 66:12-68:21.  During that period, Officer Ting observed Plaintiff manipulate the emergency service gate from the inside, "insert[ ] a random object between the metal grids" (although he "didn't see the object itself"), and "lightly close" the gate.  Ting Dep. Tr. 64:14-20, 68:22-69:10; Pl.'s 56.1 ¶ 34; Defs.' Counter 56.1 ¶ 34.[5]  Officer Ting also testified that he "observe[d] Plaintiff physically opening the emergency door for" "around" "five individuals" "to go onto the [subway] platform."  Ting Dep. Tr. 67:13-24; Pl.'s 56.1 ¶ 35; Defs.' Counter 56.1 ¶ 35.

In the criminal complaint, Officer Martinez attests, under penalty of perjury, that he was informed by Officer Ting that Plaintiff approached individuals and stated, in substance, "I will let you through the gate for $5," that "approximately five individuals gave [Plaintiff] $5," and that, "in return, [Plaintiff] opened the gate allowing the individuals to bypass the turnstiles."  Ex. 6.[6]

_____

[5] In his Counter Rule 56.1 Statement, Plaintiff asserts that Officer Ting "does not recall observing the object that Plaintiff allegedly placed in the emergency gate."  Pl.'s Counter 56.1 ¶ 26.  In Plaintiff's Rule 56.1 Statement, he also contends that Officer Ting "did not see him insert a small object" into the emergency service gate.  Pl.'s 56.1 ¶ 34.  However, these assertions are contradicted by the record.  As Defendants correctly point out, *see* Defs.' Counter 56.1 ¶ 34, in the cited portions of Officer Ting's testimony, Officer Ting stated that he "didn't see the object" that Plaintiff inserted into the emergency gate, not that he could not *recall* seeing this object.  Ting Dep. Tr. 68:23-69:7.  In addition, Officer Ting attested that he *did see* Plaintiff "jam[ ] the door, the service gate by inserting a random object between the metal grids."  Ting Dep. Tr. 64:14-20.  The Court relies on the record.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001) ("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently."); *Bertuglia v. City of New York*, 133 F. Supp. 3d 608, 616 (S.D.N.Y. 2015) ("[E]ven if the plaintiffs' responses to disputed facts are deficient . . . this Court must still ascertain that the record supports all the facts in that Statement.").

[6] Plaintiff asserts, and Defendants contest, that Officer Ting testified that "he did not hear th[e] words" Plaintiff allegedly said to the five individuals as alleged in the criminal complaint.  Pl.'s

9

At his June 2, 2022 deposition, Officer Ting testified that he did not "remember" whether he saw this exchange of currency. Ting Dep. Tr. 66:9-11. Later during his deposition, he responded "[y]es" when asked, "You saw [Plaintiff] grab hands with one of the five people, but you physically didn't see currency?" *Id.* at Tr. 70:16-20.[7] Officer Ting relayed his observations to Officer Martinez and Sergeant Rodriguez, who arrested Plaintiff. Defs.' 56.1 ¶ 30; Pl.'s Counter 56.1 ¶ 30; Pl.'s 56.1 ¶¶ 33, 35; Defs.' Counter 56.1 ¶¶ 33, 35; *see* Ex. H (September 22, 2018 arrest record identifying Officer Martinez as the arresting officer and Sergeant Rodriguez as the "Supervisor Approving" officer); Ex. I (Officer Martinez's body cam footage from September 22, 2018 arrest) at 0:39-1:23 (identifying themselves to Plaintiff as Officer Martinez and Sergeant Rodriguez).

Officer Ting then exited the northbound platform, crossed the street, and entered the southbound side of the station to find Plaintiff already arrested. Pl.'s 56.1 ¶ 35; Defs.' Counter 56.1 ¶ 35. While Plaintiff was under arrest, Officer Martinez secured a piece of adhesive tape from the emergency gate. Ex. I at 1:20-1:40. In the criminal complaint, Officer Martinez attests that he was "informed by Officer Ting that he observed [Plaintiff] . . . place a piece of tape along the magnetic strip of the gate door," which "prevented the gate from fully closing." Ex. 6. The arrest record alleges that Plaintiff "WAS OBSERVED PLACING A PIECE OF TAPE ON THE MAGNETIC LOCKING MECHANISM OF THE EMERGENCY EXIT GATE PREVENTING

---

56.1 ¶ 37; Defs.' Counter 56.1 ¶ 37. However, in response to the question, "[d]id you actually hear the things that [Plaintiff] was saying to the individual[s] around him" as attested in the criminal complaint, *see* Ex. 6, Officer Ting testified that "[y]ou can actually hear what they are saying on the other side" of the station "[w]hen there are no trains passing," but "[p]robably not those specific words." Ting Dep. Tr. 78:10-79:9. Officer Ting further testified that he "probably can't recall" whether he heard those "specific words." *Id.* at 79:16-17. The Court relies on the record. *See Holtz*, 258 F.3d at 74.

[7] Citing Officer Ting's deposition testimony, Plaintiff avers that Officer Ting "did not observe any exchange of cash." Pl.'s 56.1 ¶ 35. In their counterstatement, Defendants correctly assert that Officer Ting testified that he didn't "remember" whether he saw an "exchange of currency." Ting Dep. Tr. 66:9-11; *see* Defs.' Counter 56.1 ¶ 35.

THE LOCK FROM WORKING, PERMITTING UNLIMITED ACCESS INTO THE TRANSIT SYSTEM." Ex. H.

Plaintiff was thereafter detained at the Transit District Precinct before being transported to Central Booking, where he was detained before his release from physical custody after his criminal court arraignment.  Pl.'s 56.1 ¶ 39; Defs.' Counter 56.1 ¶ 39.  The criminal complaint charged Plaintiff with Criminal Tampering in the Second Degree in violation of New York Penal Law § 145.15, Unlawful Sale or Reproduction of a MetroCard in violation of 21 N.Y.C.R.R. § 1050.4(c), Loitering in violation of New York Penal Law § 240.35(6), and Unlawful Solicitation in the Subway in violation of 21 N.Y.C.R.R. § 1050.6(b)(2).  Ex. 5.

### B.  Procedural Background

On July 8, 2019, Plaintiff commenced this action.  ECF No. 1.  On November 26, 2019, Plaintiff filed an Amended Complaint.  *See* Am. Compl.  On August 26, 2020, Plaintiff voluntarily dismissed his excessive force claim and any and all federal and state claims that were or could have been asserted against Defendants Jane or John Does 1-10.  ECF No. 29.[8]  On June 17, 2021, the Court granted in part and denied in part Defendants' partial motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  *See Delgado*, 2021 WL 2473817. Pursuant to that decision, Plaintiff's claims for intentional and negligent infliction of emotional distress and denial of the right to a fair trial were dismissed with prejudice, while Plaintiff's claims for malicious abuse of process, deprivation of rights and denial of equal protection of laws, and conspiracy and failure to prevent conspiracy were denied without prejudice.  *See id.*

---

[8] The stipulation voluntarily dismissing Plaintiff's excessive force claim also purported to dismiss a federal claim for malicious prosecution.  ECF No. 29.  However, the parties agreed that this was in error, as the Amended Complaint did not allege such a claim.  *See Delgado v. City of New York*, No. 19 Civ. 6320 (JPC), 2021 WL 2473817, at *4 n.3 (S.D.N.Y. June 17, 2021).

Plaintiff declined to seek leave to further amend his complaint. ECF No. 58. Thus, Plaintiff's remaining claims are false arrest and false imprisonment and unlawful search and seizure in violation of the Fourth Amendment, pursuant to 42 U.S.C. § 1983 and New York law; failure to intervene in violation of the Fourth Amendment, pursuant to 42 U.S.C. § 1983 and New York law; municipal "*Monell*" liability under 42 U.S.C. § 1983; and assault and battery and negligent hiring, retention and supervision under New York law. *See* Am. Compl. ¶¶ 118-149, 214-237.

## II.  LEGAL STANDARD

### A.  Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "[W]here the nonmovant will bear the ultimate burden of proof on an issue at trial, the moving party may satisfy its burden" under Rule 56 by "point[ing] to an absence of evidence to support an essential element of the nonmoving party's" case. *Id.* (quoting *Brady v. Town of Colchester*, 863 F.2d 205, 210-11 (2d Cir. 1988)). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

In evaluating whether there is a genuine issue of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). However, a party "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary

judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).  Instead, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  "Summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"  *Johnson*, 680 F.3d at 236 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### B.  Probable Cause to Arrest

 "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under [New York] state law or under [42 U.S.C.] § 1983."  *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (internal quotations omitted) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).  "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  *Id.* (quoting *Weyant*, 101 F.3d at 852).  "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *see Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006).  Therefore, the "arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."  *Devenpeck*, 543 U.S. at 153.  "[P]robable cause does not require an awareness of a particular crime, but only that some crime may have been committed."  *Ackerson v. City of White Plains*, 702 F.3d 15, 20 (2d Cir. 2012) (internal quotations and citation omitted).

"The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers, or may require a trial if the facts are in dispute."  *Weyant*, 101 F.3d at 852 (citations omitted).

### C.  Qualified Immunity (Arguable Probable Cause)

"Under federal law, a police officer is entitled to qualified immunity, where '(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act.'"  *Jenkins*, 478 F.3d at 87 (internal quotations omitted) (quoting *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001)).  Even absent probable cause, an officer will be entitled to qualified immunity on a claim for false arrest[9] if there was "arguable probable cause" for an arrest.  Arguable probable cause exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met."  *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (quoting *Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013)).  "Put another way, an arresting officer will find protection under the defense of qualified immunity unless no reasonably competent officer could have concluded, based on the facts known at the time of arrest, that probable cause existed."  *Id.* (internal quotations omitted).

Because "a similar doctrine [to qualified immunity] exists under New York common-law," if Defendants are "entitled to qualified immunity under federal law, summary judgment would be similarly appropriate on [Plaintiff's] state law . . . claim."  *Id.* at 86-87.  "Summary judgment for defendants on grounds of qualified immunity" is appropriate "if the evidence is such that, even when it is viewed in the light most favorable to the plaintiff[ ] and with all permissible inferences drawn in [his] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established

---

[9] The Court hereinafter uses the term "false arrest" to refer to Plaintiff's "false arrest and false imprisonment" claims, as "claims for false arrest and false imprisonment are analyzed identically."  *Feinberg v. City of New York*, No. 99 Civ. 12127 (RC), 2004 WL 1824373, at *2 (S.D.N.Y. Aug. 13, 2004).

right." *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) (quoting *Williams v. Greifinger*, 97 F.3d 699, 707 (2d Cir. 1996)). Qualified immunity is "an affirmative defense as to which the defendants have the burden of proof." *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011).

### III.   DISCUSSION

"There is no doubt that the right to be free from arrest without probable cause was clearly established" at the time of Plaintiff's arrest. *Jenkins*, 478 F.3d at 87 (citing *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)). With that in mind, and in light of the parties' arguments and the nature of Plaintiff's claims, the principal question before the Court is whether Defendants had probable or arguable probable cause to arrest Plaintiff on April 23, May 4, and September 22, 2018 sufficient to defeat Plaintiff's false arrest claims. Because the Court answers this question in the affirmative, the Court grants Defendants' motion for summary judgment on Plaintiff's false arrest claims. The Court separately analyzes Plaintiff's remaining claims and holds that Defendants are also entitled to summary judgment on Plaintiff's unlawful search and seizure, failure to intervene, and *Monell* claims. The Court declines to exercise pendent jurisdiction over Plaintiff's state law claims for assault and battery and negligent hiring, retention and supervision and, therefore, dismisses those claims.

### A.  False Arrest

"To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)); *see* 42 U.S.C. § 1983. "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant*, 101 F.3d at 852 (citations omitted).

"In order to sustain a claim for false arrest under 42 U.S.C. § 1983 and New York law, a plaintiff must show that 'the defendant intentionally confined him without his consent and without justification.'" *Dufort v. City of New York*, 874 F.3d 338, 347 (2d Cir. 2017) (quoting *Weyant*, 101 F.3d at 852).

Where, as here, "an officer makes an arrest without a warrant, the presumption arises that the plaintiff's arrest was unlawful." *Jenkins*, 478 F.3d at 88. "[T]his presumption is rebutted if, applying the reasonable, prudent person test, the arresting officer, acting in good faith, had '[probable] cause for believing the person to be arrested to have committed [a crime].'" *Id.* (quoting *Dillard v. City of Syracuse*, 831 N.Y.S.2d 913, 915 (N.Y. App. Div. 1976)). "Because probable cause to arrest constitutes justification, there can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). "[I]f, when the facts are construed in favor of the plaintiff, the officer's probable cause determination was *objectively* reasonable," the Court "should dismiss the plaintiff's false arrest claim at the summary judgment stage." *Jenkins*, 478 F.3d at 88. However, even if probable cause is lacking, if "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met," the Court should dismiss false arrest claims on the basis of qualified immunity. *Figueroa*, 825 F.3d at 100; *see Jenkins*, 478 F.3d at 87.

Defendants argue that, for each of Plaintiff's arrests, "[D]efendants had probable cause" (or, in the alternative, "arguable probable cause") "to arrest [P]laintiff for loitering, panhandling, and allowing unauthorized access to the subway system." Defs.' Br. 7-12. Although Defendants cite other facts in support of probable or arguable probable cause, they contend that officers' "undisputed observations of multiple tourists speaking with [P]laintiff, handing him money, and

then entering the subway system"—those facts alone—gave rise to probable cause on all three dates."  ECF No. 121 (Defs.' Reply) at 6; Defs.' Br. 7-12.

Plaintiff argues that Defendant officers lacked both probable and arguable probable cause for each of his arrests because (1) "any evidence to support either probable cause or arguable probable cause for each of Plaintiff's arrests was gathered after he was cuffed and physically restrained"; (2) "the remaining evidence Defendant officers relied on . . . required observing only physical conduct of Plaintiff's interactions with other individuals in the subway from a distance"; and (3) "a factfinder is required to determine the credibility of Defendant officers and the accuracy of their observations," due to "conflicting evidence proffered by Plaintiff's testimony and allegations set forward in the criminal court complaints from his May 4, 2018 and September 22, 2018 arrests."  ECF No. 111 (Pl.'s Br.) at 7-8.  Plaintiff also argues that "Defendants obtained the evidence needed to support probable cause" in "bad faith."  *Id.* at 23-25.

Because Plaintiff's three arrests were made without a warrant, a rebuttable presumption of unlawfulness applies.  *See Jenkins*, 478 F.3d at 88.  The question, therefore, is whether the undisputed material facts demonstrate, "applying the reasonable, prudent person test," that Defendants, "acting in good faith," had probable cause to arrest Plaintiff—and if not, whether they had arguable probable cause.  *Id.*  Here, Defendants argue that, for each of the arrests, they had probable cause (or, in the alternative, arguable probable cause) to arrest Plaintiff for loitering in a transportation facility for a commercial purpose, pursuant to New York Penal Law § 240.35(6); unauthorized commercial activity (often referred to as "panhandling"), pursuant to 21 N.Y.C.R.R. § 1050.6(b)(2); and unauthorized sale of fare media, pursuant to 21 N.Y.C.R.R. § 1050.4(c).  Defs.' Br. 7-12.  Accordingly, when considering whether the Defendants had probable or arguable probable cause for each of Plaintiff's arrests, the Court will evaluate whether there were lawful grounds for arresting Plaintiff for these offenses.

It is of no moment that Plaintiff was not charged with each of these offenses (*see* Factual Background, *supra*), as "[t]he existence of probable cause to arrest—even for a crime other than the one identified by the arresting officer—will defeat a claim of false arrest." *Figueroa*, 825 F.3d at 99; *see Devenpeck*, 543 U.S. at 152-54; *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006).   In addition, "[t]he collective knowledge doctrine," and New York's analogous "fellow officer" rule, "provides that, for the purpose of determining whether an arresting officer had probable cause to arrest, 'where law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is presumed shared by all.'" *Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003) (quoting *Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983)); *see People v. Rosario*, 78 N.Y.2d 583, 588 (N.Y. 1991).   "Thus, an arresting officer is deemed to act with probable cause when making an arrest at the direction of another law enforcement officer who has the requisite probable cause." *Rosario*, 78 N.Y.2d at 588.

### 1.   The April 23, 2018 Arrest

Under New York Penal Law § 240.35(6), "[a] person is guilty of loitering when he . . . [l]oiters or remains in any transportation facility . . . for the purpose of soliciting or engaging in any business, trade or commercial transactions involving the sale of merchandise or service." N.Y. Penal Law § 240.35(6).  With respect to panhandling under 21 N.Y.C.R.R. § 1050.6(b)(2), "[n]o person shall panhandle or beg upon any facility or conveyance" of the New York City transit system.  21 N.Y.C.R.R. § 1050.6(b)(2).   Finally, a violation of unauthorized sale of fare media occurs when a person, other than the Metropolitan Transit Authority ("MTA") or its agents "sell[s], provide[s], cop[ies], reproduce[s] or produce[s], or create[s] any version of any fare media or otherwise authorize[s] access to or use of the facilities, conveyances or services of the [MTA]." 21 N.Y.C.R.R. § 1050.4(c).  Because these offenses are violations rather than crimes, "the offense must occur in the officer's presence to provide probable cause to arrest." *Kee v. City of New York*,

12 F.4th 150, 159 (2d Cir. 2021) (citing N.Y. Crim. Proc. Law § 140.10(1)). [10]  In all other respects,

the probable cause analysis in this case is the same regardless of whether the offense the Plaintiff

was suspected of potentially committing is a "violation" or a "crime."  *See id.* (treating "reasonable

cause" to commit a violation under New York law as equivalent to "probable cause" in the context

of false arrest claims under New York and federal law).

Here, it is uncontested that, before Plaintiff was arrested on April 23, 2018, Plaintiff

"entered the subway station at 49th Street and 7th Avenue" in Manhattan; that Officer Samsuddin,

who was "on the northbound platform" opposite to Plaintiff, "observed [P]laintiff speak with more

than [ten] tourists" "[o]ver the course of approximately ten[ ] minutes"; and that "some of those

tourists handed [P]laintiff money before entering the subway system." Defs.' 56.1 ¶¶ 1, 4, 5; Pl.'s

Counter 56.1 ¶¶ 1, 4, 5; Pl.'s 56.1 ¶ 11; Defs.' Counter 56.1 ¶ 11.  Officer Samsuddin also watched

Plaintiff "swipe some individuals into the subway system" and "manipulate two MetroCards" and

"use them to swipe other people in."   Pl.'s 56.1 ¶¶ 13, 14; Defs.' Counter 56.1 ¶¶ 13, 14.   In

addition, "[b]ased on his observations" of Plaintiff, "[Officer] Samsuddin believed [that] [P]laintiff

had 'sold a swipe' to [a] female subway passenger"— "in other words, that Plaintiff had allowed

the female passenger to enter the subway system in exchange for money."  Defs.' 56.1 ¶ 7; Pl.'s

Counter 56.1 ¶ 7.  Officer Samsuddin "waited until he visually observed" an "exchange of cash

between Plaintiff" and the female subway passenger before he communicated to Sergeant Kelly

and Officer Nunez that "there was an exchange of cash."  Pl.'s 56.1 ¶¶ 13, 16; Defs.' Counter 56.1

¶¶ 13, 16; Ex. C at 0:49-0:54; Ex. D.

---

[10] *See* N.Y. Penal Law § 240.35 ("Loitering is a violation."); *compare id.* § 10.00(3) (defining a
"[v]iolation" as "an offense, other than a 'traffic infraction,' for which a sentence to a term of
imprisonment in excess of fifteen days cannot be imposed"), *with id.* § 10.00(6) (defining a
"[c]rime" as a "misdemeanor or a felony"); *see also* 21 N.Y.C.R.R. § 1050.10 (explaining that
"any person committing one or more violations of these rules," which include §§ 1050.4(c) and
1050.6(b)(2), may be subject to "a term of imprisonment for not longer than 10 days").

Plaintiff maintains, and Defendants contest, that "[m]aterial issues of fact" exist because Officer Samsuddin "observ[ed] . . . Plaintiff's conduct from a distance of at least forty [ ] feet away on the opposite platform with [his] vision obscured by passing trains, permanent fixtures, and crowds." Pl.'s Br. 16-17; *see* Pl.'s Counter 56.1 ¶ 6; Defs.' Counter 56.1 ¶ 11.[11]  Plaintiff has not cited anything in the record supporting those assertions.  Such unsupported assertions "should be disregarded and the record reviewed independently" on a motion for summary judgment.  *Holtz*, 258 F.3d at 74; *see Bertuglia*, 133 F. Supp. 3d at 616.

Here, Officer Samsuddin's testimony directly contradicts Plaintiff's claims, as Officer Samsuddin confirmed that he could "see through" the "grate"-like "revolving turnstiles"; the subway stations' "pillars [did not] block" his view of Plaintiff; and that, "at the moment of the transaction, there was no train."  Samsuddin Dep. Tr. 45:18-47:23, 82:7-13.  In addition, Plaintiff does not contest that Officer Samsuddin observed him interact with tourists for approximately ten minutes.  Officer Samsuddin was able to describe those interactions in detail during his deposition, further undermining Plaintiff's argument that the officer was unable to view Plaintiff's behavior prior to his arrest.  *See, e.g.*, *id.* at Tr. 44:11-45:17 (testifying that Plaintiff "was back and forth from the [MetroCard] machine to the turnstile" and "the revolving door" in the mezzanine area).  "[A]ny attempt to argue that" Officer Samsuddin did not observe Plaintiff's conduct "would be

---

[11] Officer Ting testified with respect to Plaintiff's arrest on September 22, 2018, that the distance between where Officer Ting sat on a "bench on the platform on the northbound" side of the 49th Street and 7th Avenue subway station was "possibly more than 60 less than a hundred" feet from where he observed Plaintiff on the "southbound mezzanine."  Ting Dep. Tr. 66:12-67:4, 68:13-:21.  This is not materially different from Officer Samsuddin's testimony that when he viewed Plaintiff from "the northbound side of the platform," that was "approximately 40 feet" from Plaintiff's location on "the southbound side."  Samsuddin Dep. Tr. 43:16-22.  Indeed, both parties have stated that Officer Ting's and Samsuddin's testimony on that issue is true.  *See* Pl.'s 56.1 ¶¶ 11, 34; Defs.' Counter 56.1 ¶¶ 11, 34.  Therefore, the Court accepts as true that the northbound and southbound sides of the station where the officers and Plaintiff were respectively located were approximately forty to 100 feet apart.

pure speculation that is wholly unsupported by any rational inference from the record." *Kee*, 12 F.4th at 160.  Thus, Plaintiff has failed to create a "genuine dispute of material fact" with respect to that issue.  *Id.* at 166.

According to Plaintiff, Officer Samsuddin's testimony that he "never overheard Plaintiff's interactions with individuals in the subway system" undermines probable cause.  Pl.'s Br. 16 (citing Samsuddin Dep. Tr. 81:9-15).  Whether Officer Samsuddin *heard* Plaintiff's conversations is irrelevant, however, as he decided to alert the arresting officers of a potential offense based on his *observation* that Plaintiff had "collected money from [a] female" passenger.  Samsuddin Dep. Tr. 78:17-79:2 (testifying that he "told [Officers Nunez and Kelly] that [he] saw completely the transaction" and that Plaintiff "collected money from [a] female," which "was a probable cause, and we arrested him for that"); *see People v. Gonzalez*, 908 N.Y.S.2d 848, 849-50 (N.Y. Crim. Ct. 2010) ("Begging" for purposes of 21 N.Y.C.R.R. § 1050.6(b), "does not necessary [sic] require the articulation of words," as "[g]esture may communicate an idea just as well as speech depending on the circumstances").

The Court holds that Officer Samsuddin—and therefore, arresting Officers Nunez and Kelly—had probable cause to arrest Plaintiff on April 23, 2018.  The "totality of circumstances," including Officer Samsuddin's uncontested observations of Plaintiff's conduct prior to his arrest—*e.g.*, that he observed Plaintiff speak with tourists and some of them handed him money before entering the subway system—were "sufficient to warrant a person of reasonable caution in the belief" that Plaintiff was loitering, panhandling, and engaging in the unauthorized sale of fare media.  *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (quoting *Jaegly*, 439 F.3d at 152). Therefore, Officers Nunez and Kelly "need not have personally observed" Plaintiff's actions because "probable cause was established" based on Officer Samsuddin's observations.  *Bell v. City of New York*, No. 19 Civ. 5868 (NRB), 2022 WL 870589, at *6-7 (S.D.N.Y. Mar. 21, 2022)

(holding that arresting officers had probable cause for loitering for the purpose of gambling where third officer "observed . . . individuals engaging in behavior that was consistent with gambling based on his prior experience" (internal quotations omitted)).

Those observations included not only an exchange of cash between Plaintiff and a woman who subsequently entered the subway system, but also Plaintiff's discussions "with more than [ten] tourists" and that Plaintiff had "swipe[d] some individuals into the subway system."  Defs.' 56.1 ¶¶ 4, 7; Pl.'s Counter 56.1 ¶¶ 4, 7; Pl.'s 56.1 ¶ 13; Defs.' Counter 56.1 ¶ 13; *see, e.g.*, *Kee*, 12 F.4th at 161 (finding officers had probable cause that plaintiff was loitering for the purpose of gambling under N.Y. Penal Law § 240.35 where the officers did not see the plaintiff "actually rolling the dice on the ground," based on "their observation of the dice in the hand of [plaintiff] or his friend, combined with [plaintiff's] statement to Detective Anzalone to 'lock [him] up' for 'rolling dice'"); *People v. Cherry*, 76 Misc. 3d 136(A), 174 N.Y.S.3d 785 (N.Y. App. Term. 2022), *leave to appeal denied*, 39 N.Y.3d 1077 (N.Y. 2023) ("One who swipes another person into the subway system for money but does not enter himself, clearly violates the purpose and plain language of 21 [N.Y.C.R.R.] 1050.4[c]."); *see also, e.g.*, *Gonzalez*, 908 N.Y.S.2d at 850 ("The approaching of three separate individuals and the making of such a gesture [of holding out defendant's open hand] in front of a subway turnstile gives reasonable cause to believe that the defendant was begging for money" in violation of 21 N.Y.C.R.R. § 1050.6(b)).

It is also uncontested that Officer Samsuddin saw Plaintiff "manipulate two MetroCards" and "use them to swipe people in."  Pl.'s 56.1 ¶ 14; Defs.' Counter 56.1 ¶ 14.  Officer Samsuddin testified that "scammers" will "manipulate MetroCards by bending them," "which allows the MetroCard to be used at a turnstile even if [it is] not preloaded with money for subway fare," and that this is a "charge[able] offense."  Pl.'s 56.1 ¶¶ 5, 9; Defs.' Counter 56.1 ¶¶ 5, 9; Samsuddin Dep. Tr. 65:22-67:6, 68:13-:18, 69:12-70:8.  This observation further supported a belief that

Plaintiff had engaged in, at a minimum, an unauthorized sale of fare media in violation of 21 N.Y.C.R.R. § 1050.4(c). *See Cherry*, 76 Misc. 3d 136(A) (finding that "[t]he circumstances of defendant's possession of multiple [bent] MetroCards, his use of one of them to swipe [a] (plainclothes) officer through the turnstile in exchange for [cash]," among other facts, "further supported [defendant's] guilt under 21 [N.Y.C.R.R.] 1050.4[c]").

Plaintiff argues that officers lacked probable cause because Plaintiff made statements about "panhandling" after he had been placed under arrest and because Plaintiff understood the word "panhandling" to mean "[a]ssisting people with the directions." Pl.'s Br. 16; Pl.'s Dep. Tr. 152:11-14. Plaintiff also disputes the use of the MetroCards collected by Officer Samsuddin following Plaintiff's arrest as evidence against him. Pl.'s Br. 18. However, because these facts developed after Plaintiff's arrest, the Court does not consider them when evaluating whether the officers had probable cause to arrest him.

As Plaintiff himself concedes, *see* Pl.'s Br. 16, and as the Court explained in its June 17, 2021 decision on Defendants' motion for judgment on the pleadings, it is the "facts known to the arresting officer at the time of the arrest" that "would support a reasonable conclusion that probable cause existed" not "what transpired after [Plaintiff] was already in handcuffs and being searched." *Delgado*, 2021 WL 2473817, at *7 (quoting *Devenpeck*, 543 U.S. at 152). In addition, the fact that "an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." *Panetta*, 460 F.3d at 395 (quoting *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985)). Accordingly, these post-arrest events are irrelevant to the probable cause inquiry and do not undermine the conclusion that Officer Samsuddin—and therefore, arresting Officers Nunez and Kelly—had probable cause to arrest Plaintiff on April 23, 2018.

## 2. The May 4, 2018 Arrest

The parties do not dispute that, on May 4, 2018, Plaintiff returned to the subway station at 49th Street and[ ]7th Avenue, and that prior to his arrest, he (1) "spoke with more than [ten] tourists"; (2) some of those tourists "handed Plaintiff money before entering the subway system"; and (3) someone "asked [him] if he had change for a twenty [ ] dollar bill."  Defs.' 56.1 ¶¶ 17-19; Pl.'s Counter 56.1 ¶¶ 17-19; Pl.'s 56.1 ¶ 23; Defs.' Counter 56.1 ¶ 23.  The parties also agree that Officer Ting "informed" Officers Martinez and Sergeant Rodriguez of his observations, and that the officers arrested Plaintiff and another individual.  Pl.'s 56.1 ¶ 27; Defs.' Counter 56.1 ¶ 27; *see* Ex. 5.[12]

In light of Officer Ting's failure to recall details of Plaintiff's May 4, 2018 arrest during his June 2, 2022 deposition, and his testimony that he "didn't observe [Plaintiff] committing the crime that day," Ting Dep. Tr. 42:3-10; *see* Pl.'s Br. 18-19, 24-25; Defs.' Reply 2-4, the parties disagree as to whether there is a genuine issue of material fact concerning probable cause to arrest Plaintiff.  Plaintiff argues that because Officer Ting "did not observe Plaintiff commit any criminal conduct on May 4, 2018, his testimony clearly conflicts with the criminal court complaint signed by Defendant Martinez, indicating that Defendant Ting was allegedly solicited by Plaintiff for a swipe," indicating that "either he or Defendant Martinez fabricated the allegations in the complaint," and that "there was a lack of evidence to support probable cause."  Pl.'s Br. 18-19; *see id.* at 23-25 (making similar arguments with respect to arguable probable cause).  At a minimum,

---

[12] The arrest record and the criminal complaint contain contradictory facts regarding other conduct for which Plaintiff may have been arrested, such as manipulating the emergency exit door.  *Compare* Ex. E, *with* Ex. 5.  The Court does not consider those facts—and they do not impact the Court's probable cause analysis—as there is no evidence demonstrating the impact, if any, of that information on the officers' decision to arrest Plaintiff.  *See Stansbury*, 721 F.3d at 92 n.9 ("There is no evidence that [witness] communicated these observations to [officer]; because they were not a factor in [officer's] decisions to arrest and prosecute [plaintiff], we do not consider them.").  In any event, the Court holds that there was at least arguable probable cause for Plaintiff's arrest irrespective of these facts.

Plaintiff argues that there are "at the least, triable issues-of-fact" on this issue, "as the record is replete with conflicting testimony and evidence," precluding summary judgment. *Id.* at 19.

Defendants argue that Officer Ting's "lack of recollection is immaterial," as probable cause is determined based on the "facts immediately available to an officer at the time of the arrest" and there was probable cause at the time of Plaintiff's arrest "[b]ased on [the] undisputed facts." Defs.' Reply 3 (quoting *Norales v. Acevedo*, No. 21-549, 2022 WL 17958450, at *4 (2d Cir. Dec. 27, 2022)). Specifically, "even if [Officer] Ting was ultimately mistaken in his observations," the arresting officers "had probable cause to arrest [P]laintiff based on information that [Officer] Ting relayed to them." *Id.* Defendants also argue that Plaintiff's accusations regarding the purported fabrication of evidence "sound more clearly in [a] malicious prosecution or denial of a fair trial" claim—claims that the Court already dismissed—than on a false arrest claim. *Id.* at 4.[13]

The Court addresses Plaintiff's arguments in turn. First, Plaintiff's argument that the officers fabricated evidence—in support of which he offers no citations to the record or legal authority—is speculative and threadbare. *See* Pl.'s Br. 18-19. "In evaluating the probable cause determination," the Court considers "the facts available to the officer at the time of the arrest."

---

[13] Additional arguments advanced by the parties do not impact the Court's probable cause analysis because they are unsupported by the record or are immaterial. For example, Defendants argue that there was probable cause to arrest Plaintiff solely based on "their undisputed observations of multiple tourists speaking with [P]laintiff, handing him money, and then entering the subway system." Reply 6; *see* Defs.' Br. 7. In purported support, Defendants cite Plaintiff's deposition testimony referenced in their Rule 56.1 Statement. *See* Defs.' Br. 7 (citing, *e.g.*, Defs.' 56.1 ¶¶ 17-20). However, Plaintiff's testimony with respect to his May 4, 2018 arrest does not directly support Defendants' assertion that officers "observ[ed]" Plaintiff engaging in this conduct. While Plaintiff testified that officers were "watching" him, he said that the officers told him they saw him "tampering with the machine . . . swiping" and something involving a "forged instrument." Pl.'s Dep. Tr. 84:16-22, 85:12-15. Separately, Plaintiff argues that "Plaintiff observed the Defendant officers once again gathering MetroCards from around the Subway Station because the . . . Defendant officers did not have the evidence required for Plaintiff's arrest." Pl.'s Br. 19. There is no evidence in the record that this information was available to officers and relied upon prior to Plaintiff's arrest. Plaintiffs' allegation regarding the officers' gathering of MetroCards is therefore irrelevant. *See Stansbury*, 721 F.3d at 92 n.9.

*Martinez*, 202 F.3d at 635 (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)).  Officers are "entitled to rely on the allegations of fellow police officers." *Id.* at 634.  Here, "there is no evidence" that the arresting officers "would have any reason to believe that" Officer Ting "would fabricate" the information he conveyed to them, and they were entitled to rely upon that information when deciding to arrest Plaintiff.  *Demosthene v. City of New York*, 831 F. App'x 530, 533 (2d Cir. 2020).  Plaintiff's "conclusory and speculative assertions of fabrication are insufficient to create a genuine issue of fact" with respect to any purported fabrication of evidence. *Id.* at 533-34.

Second, the Court disagrees that alleged "inconsistencies" in Officer Ting's deposition testimony create a genuine issue of material fact relating to whether the arresting officers, Officer Martinez and Sergeant Rodriguez, were "reasonable in relying on" information provided by Officer Ting.  *Bernard v. United* States, 25 F.3d 98, 103 (2d Cir. 1994); *see* Pl.'s Br. 18-19. According to Officer Martinez's sworn allegations in the criminal complaint, "the facts available to the officer at the time of the arrest," *see Martinez*, 202 F.3d at 635, were: Plaintiff "approached Officer Ting," and "stated to him in substance," "Do you need a ride? I can get you on?"; "Officer Ting stated to [Plaintiff] that he only had a $20.00 dollar bill to pay for a swipe into the transit system"; Plaintiff stated, in "substance," "No problem"; and "Officer Ting then observed [Plaintiff] thumbing through U.S. currency in his hands to make change for Officer Ting."  Ex. 5. The arrest record alleges that Plaintiff "ATTEMPTED TO SELL AN ENTRY/RIDE TO A PLAINCLOTHES POLICE OFFICER."  Ex. E.

Plaintiff does not dispute that Officer Ting was "in plain clothes" or that Officer Ting "informed" Officer Martinez and Sergeant Rodriguez of his observations prior to Plaintiff's arrest. Pl.'s 56.1 ¶ 27; Defs.' Counter 56.1 ¶ 27.  Based on the record and these undisputed facts, there is no genuine dispute that Officer Ting was the purported "unknown individual" whom Plaintiff

argues offered Plaintiff a twenty-dollar bill.  *See* Pl.'s Br. 19; Pl.'s 56.1 ¶ 23; *Scott*, 550 U.S. at

380 ("At the summary judgment stage, facts must be viewed in the light most favorable to the

nonmoving party only if there is a 'genuine' dispute as to those facts." (quoting Fed. R. Civ. P.

56(c))); *Kee*, 12 F.4th at 160 (holding, based on "uncontroverted facts," that plaintiff's argument

was "pure speculation that [was] wholly unsupported by any rational inference from the record").

Even if Officer Ting could not recall details about his interactions with Plaintiff more than

four years after Plaintiff's May 4, 2018 arrest, and stated at his June 2, 2022 deposition that he had

not observed the offense, that does not change the underlying facts relevant to probable cause that

were "available to the [arresting] officer[s] at the time of the arrest and immediately before it."

*Panetta*, 460 F.3d at 395 (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002)).  "It

is well-established that contradictory evidence *known to the officers at the time of arrest* can negate

probable cause by giving rise to a duty of further inquiry."  *Torres v. City of New York*, No. 20

Civ. 4007 (BMC), 2022 WL 955152, *4 (E.D.N.Y. Mar. 30, 2022) (emphasis added).  However,

as previously explained, Plaintiff does not point to any contradictory evidence or other information

"known to the officers at the time of arrest" that would have "put the officers on notice" that

Officer Ting's statements "were not credible."  *Id.*; *see Martinez*, 202 F.3d at 634-35.

"The probable cause determination does not rest on whether the instructing officer's

observations were accurate, but on whether the arresting officer was 'reasonable in relying on

those observations.'"  *Cordero v. City of New York*, 282 F. Supp. 3d 549, 561 (E.D.N.Y. 2017)

(quoting *Bernard*, 25 F.3d at 103).  Absent any information that calls into question whether the

arresting officers were "reasonable in relying on [Officer Ting's] observations"—even if Officer

Ting was mistaken in his observations of Plaintiff—is irrelevant to whether the arresting officers

had probable cause to effectuate Plaintiff's arrest.  *Bernard*, 25 F.3d at 103; *see Guerrero v. City

of New York*, No. 14 Civ. 8035 (VSB), 2018 WL 4333985, at *8 (S.D.N.Y. Sept. 11, 2018) (holding

that arresting officer had "at least arguable probable cause" to have arrested plaintiff, where, *inter alia*, officer relied on another officer's claim that an eye witness to the robbery identified plaintiff as one of the perpetrators, even if that information was later revealed to be incorrect); *Cordero*, 282 F. Supp. 3d at 564-65 (granting summary judgment on false arrest claims against arresting officers despite plaintiff's argument that information provided to the officers was incorrect).[14]

The facts supporting probable cause to arrest Plaintiff, to which Officer Martinez swore in the criminal complaint based on Officer Ting's observations, were sufficient to "warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jenkins*, 478 F.3d at 84.  In particular, Officer Martinez attested that Plaintiff "approached Officer Ting," asked him if he "need[ed] a ride," and offered to "get [him] on"; Officer Ting stated that he only had a "$20.00 dollar bill to pay for a swipe," to which Plaintiff responded, "No problem"; and "Officer Ting then observed [Plaintiff] thumbing through U.S. currency in his hands to make change for Officer Ting."  Ex. 5.  Based on that information, Officer Martinez and the other arresting officer, Sergeant Rodriguez, could reasonably believe that Plaintiff was engaging in, had engaged in, or was about to engage in the unauthorized sale of fare media pursuant to 21 N.Y.C.R.R. § 1050.4(c), panhandling, pursuant to 21 N.Y.C.R.R. § 1050.6(b)(2), and loitering "for the purpose of soliciting or engaging in a business" under New York Penal Law § 240.35(6). *See Kee*, 12 F.4th at 161 (officers had probable cause to arrest plaintiff for loitering for the purpose of gambling in violation of N.Y. Penal Law § 240.35); *see, e.g.*, *People v. Jones*, 56 Misc. 3d 128(A), 63 N.Y.S.3d 306 (N.Y. App. Term. 2017) ("[E]vidence that defendant approached a

---

[14] Plaintiff cites *United States v. Colon*, 250 F.3d 130 (2d Cir. 2001), for the proposition that "the knowledge of a 911 *civilian* operator cannot be imputed to the dispatching or arresting officers in the absence of any evidence indication [sic] that the 911 operator made any assessment of reasonable suspicion or was trained to do so."  Pl.'s Br. 15 (emphasis added).  Clearly *Colon* is distinguishable from the case at bar, as Officer Ting is a *police officer* trained to assess probable cause.  *See Colon*, 250 F.3d at 136-37.

plainclothes police officer and offered to sell him subway system access for $2.00, an offer that included defendant putting the officer on the subway by swiping him with a single-ride Metrocard and culminated with defendant swiping a MetroCard at the turnstile to provide access to the subway, was sufficient to support a finding that defendant lacked the authority or permission to sell MetroCard 'swipes'" in violation of 21 N.Y.C.R.R. § 1050.4(c)); *Gonzalez*, 908 N.Y.S.2d at 850 (approaching of individuals near subway turnstile with open hand "reasonable cause" to believe defendant engaged in violation of 21 N.Y.C.R.R. § 1050.6(b)).

In addition, Officer Ting's deposition testimony does not create a material issue of fact as to whether *he* had probable cause to arrest Plaintiff. The fact that Officer Ting failed to recall details of Plaintiff's arrest more than four years later does not create an inconsistency with respect to the facts that were available to him prior to Plaintiff's arrest—facts that are supported by the record. Nor does Officer Ting's testimony at that same deposition that he did not "observe" Plaintiff "committing" an offense undermine the key facts in the record concerning the events prior to Plaintiff's arrest. Ting Dep. Tr. 42:8-10. Officer Ting testified that he had "very little" recollection of Plaintiff's May 4, 2018 arrest and that he did not "remember" "observ[ing]" Plaintiff "engag[ing] in" "criminal conduct." *Id.* at Tr. 30:12-15, 32:5-8. Subsequently he was asked, "as you sit here today, based on your own personal recollection, you can't speak to any conduct—criminal conduct by [Plaintiff] because you just didn't observe it?" *Id.* at Tr. 42:3-7. In response, Officer Ting testified that he "didn't observe [Plaintiff] committing the crime that day . . . So, I can't speak for it, yes." *Id.* at Tr. 42:8-10.

These statements should be taken in context, as Officer Ting already had explained that he had "very little" recollection of Plaintiff's May 4, 2018 arrest, and that he was responding to a question about his "personal recollection" at the time that he sat for his June 2022 deposition. *Id.* at Tr. 30:12-15, 42:3-10. This testimony is not sufficient to create a genuine issue of material fact

regarding the uncontested facts that were available to Officer Ting prior to Plaintiff's arrest. *See*, *e.g.*, *Torres*, 2022 WL 955152, at *12-14 (holding that, even "[a]ssuming the facts in the light most favorable to plaintiff," alleged inconsistencies in officers' deposition testimonies, arrest paperwork, and other records did not dissipate probable cause based on facts prior to arrest). "To defeat summary judgment, [P]laintiff was required to come forward with more specific facts creating a genuine issue with respect to probable cause." *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (affirming summary judgment on false arrest claim where record supported that witness had been drinking in a pub but plaintiff had not set forth specific facts to undermine his credibility and demonstrate a genuine factual issue).

In the body cam footage from his arrest, Plaintiff stated that he "thought he needed change because he wanted … he said he had a MetroCard that he couldn't . . . [indecipherable] help with the machine . . . So he said if I got change for a 20, and I said yeah, I got change for a 20." Ex. F at 00:08-34. In addition, Plaintiff appears to concede in that footage that this interaction was more extensive, as someone who was standing in the same general direction and vicinity as Officer Ting off camera responded to Plaintiff's summary by stating that the interaction involved a "little more than that," to which Plaintiff responded "I know." *Id.* at 00:35-0:45.[15] Even construed in the light most favorable to Plaintiff, Plaintiff's account is not inconsistent with Officer Martinez's statements in the criminal complaint about this exchange, as reported to him by Officer Ting. *See* Ex. 5. And even if Officer Ting misunderstood Plaintiff's intent during their exchange, and Plaintiff was innocently trying to help him, that would still not be material, as "[t]he fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause."

---

[15] Even though Plaintiff's statements on the body cam footage followed his arrest, the Court may consider them in this context. The Court is not evaluating those statements to assess the facts that were available to the officers prior to Plaintiff's arrest. Instead, the Court is evaluating whether events leading to the arrest of Plaintiff are actually in dispute.

*Panetta*, 460 F.3d at 395 (quoting *Fama*, 758 F.2d at 838)); *see Curley*, 268 F.3d at 70 ("[O]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." (quoting *Ricciuti*, 124 F.3d at 128)).

The Court is required to "examine[] each piece of evidence and consider[] its probative value, and then 'look to the totality of the circumstances' to evaluate whether there was probable cause to arrest and prosecute the plaintiff." *Stansbury*, 721 F.3d at 89-92 (holding that "district court erred insofar as it did not account for the evidence 'on the totality of the circumstances'" relating to probable cause (quoting *Jenkins*, 478 F.3d at 90)). That cannot be done in a vacuum, as "[t]he significance of each of the[ ] [relevant] factors" in the probable cause analysis "may be enhanced or diminished by surrounding circumstances." *Jenkins*, 478 F.3d at 90; *see Stansbury*, 721 F.3d at 92-93. Here, it is uncontested that Plaintiff was standing in a subway station that was popular among and frequented by tourists, and that he was there long enough to "sp[eak] with more than [ten] tourists." Defs.' 56.1 ¶ 18; Pl.'s Counter 56.1 ¶ 18; Ex. F at 00:56-1:07 (stating that he "panhandles" in the station and "there's a lot of tourists"). Plaintiff testified that, after he arrived at the subway station at around 6:00 p.m. (*i.e.*, rush hour), "[h]e went back to the map," where he was "waiting until the people came down," and that he "help[s] [people] with the directions." Pl.'s Dep. Tr. 80:10-15. Plaintiff was not waiting on the subway platform facing the trains or engaging in other behavior that is typical of a subway passenger who is genuinely intending to catch a train.

Under the "totality of the circumstances," it was reasonable for Officer Ting to conclude that Plaintiff was committing an offense. *District of Columbia v. Wesby*, 583 U.S. 48, 62 (2018). Officer Samsuddin testified about tourists' vulnerability to subway scams, including scammers who offer to "help" tourists access the subway in exchange for cash, and what officers look for

when trying to detect these kinds of crimes.  *See*, *e.g.*, Samsuddin Dep. Tr. 22:14-24:24, 53:4-56:12.  Construing the facts in the light most favorable to Plaintiff—for example, if Officer Ting had approached Plaintiff (and not the other way around); if Plaintiff was trying to help Officer Ting make change to legitimately buy a MetroCard; and if Plaintiff was helping tourists with directions—the surrounding circumstances were consistent with someone who was engaging in, had engaged in, or was about to engage in the unauthorized sale of fare media pursuant to 21 N.Y.C.R.R. § 1050.4(c), panhandling, pursuant to 21 N.Y.C.R.R. § 1050.6(b)(2), or loitering "for the purpose of soliciting or engaging in a business" under New York Penal Law § 240.35(6).  *See Wesby*, 583 U.S. 48,  62 (2018) (holding that officers had probable cause under "the totality of the circumstances," which "gave the officers plenty of reasons to doubt the partygoers' protestations of innocence"); *Kee*, 12 F.4th at 161 (probable cause based on context); *see also Bell*, 2022 WL 870589, at *6-7; *Jones*, 56 Misc. 3d 128(A); *Gonzalez*, 908 N.Y.S.2d at 850.

Accordingly, the Court holds that Officer Ting, Officer Martinez, and Sergeant Rodriguez had probable cause to arrest Plaintiff on May 4, 2018.

### 3.  The September 22, 2018 Arrest

It is uncontested that, "[o]n September 22, 2018, [P]laintiff returned to the same subway station at 49th Street and 7th Avenue," that "Plaintiff stood near the map of the subway station" and that he "spoke with at least [ten] tourists"—"[s]ome of [whom] handed [him] money before entering the subway system."  Pl.'s 56.1 ¶ 31; Defs.' Counter 56.1 ¶ 31; Defs.' 56.1 ¶¶ 25, 27-28; Pl.'s Counter 56.1 ¶¶ 25, 27-28.  It is also undisputed that "[Officer] Ting watched Plaintiff for approximately fifteen [ ] minutes" "on the northbound platform," which was approximately "more than 60" but "less than a hundred" feet from Plaintiff's location on the "[s]outhbound mezzanine."  Pl.'s 56.1 ¶ 34; Defs.' Counter 56.1 ¶ 34; Ting Dep. Tr. 66:12-68:21.  During that time period, Officer Ting observed Plaintiff manipulate the emergency service gate from the inside, "insert[ ]

a random object between the metal grids" (although he "didn't see the object itself"), and "lightly close" the gate.  Ting Dep. Tr. 64:14-20, 68:22-69:10; Pl.'s 56.1 ¶ 34; Defs.' Counter 56.1 ¶ 34. Officer Ting also testified that he "observe[d] Plaintiff physically opening the emergency door for" "around" "five individuals" "to go onto the [subway] platform."  Ting Dep. Tr. 67:13-24; Pl.'s 56.1 ¶ 35; Defs.' Counter 56.1 ¶ 35.  Officer Ting relayed his observations to Officer Martinez and Sergeant Rodriguez, who arrested Plaintiff.  Defs.' 56.1 ¶ 30; Pl.'s Counter 56.1 ¶ 30; Pl.'s 56.1 ¶¶ 33, 35; Defs.' Counter 56.1 ¶¶ 33, 35; *see* Ex. 6.

In the criminal complaint, Officer Martinez attests that he was "informed by Officer Ting that" Plaintiff "approached individuals and stated, in substance," "I will let you through the gate for $5," and that "approximately five individuals gave [Plaintiff] $5" and "in return, [Plaintiff] opened the gate allowing the individuals to bypass the turnstiles."  Ex. 6.  Based on the undisputed facts, which are supported by the record, the officers had probable cause to arrest Plaintiff on September 22, 2018 for loitering "for the purpose of soliciting or engaging in any business" under New York Penal Law § 240.35(6); panhandling under 21 N.Y.C.R.R. § 1050.6(b)(2); and allowing unauthorized sale of fare media under 21 N.Y.C.R.R. § 1050.4(c).

Plaintiff argues that "Defendants fail to demonstrate that there are *no* triable issues-of-fact as to the existence of probable cause for Plaintiff's arrest on September 22, 2018."  Pl.'s Br. 20-21.  Plaintiff's arguments, some of which rely on misrepresentations of the record, are unavailing. First, Plaintiff asserts that, at his deposition, Officer Ting did "not recall searching Plaintiff or what the object was that Plaintiff allegedly inserted into the emergency service gate."  *Id.* at 20. However, Officer Ting testified that he saw Plaintiff "inserting a random object between the metal grids" of the service gate but that he "didn't see the object itself."  Ting Dep. Tr. 64:14-20, 68:22-69:10.  Officer Ting's recollection of the nature of that object is irrelevant, as the Court already accepts as true—in the light most favorable to Plaintiff—that Officer Ting didn't see what the

"object" was.  *Id.*  Whether Officer Ting recalled "searching Plaintiff" is immaterial, as there is no

evidence that the officers, when determining whether to arrest Plaintiff, relied upon any

information gathered through any pre-arrest search.  *See Stansbury*, 721 F.3d at 92 n.9; *see*

*generally Devenpeck*, 543 U.S. at 152.

Plaintiff further asserts that Officer Ting "testified that he did not" "actually hear[] the

conversations attested to in the Criminal Complaint" "between the five [ ] individuals and Plaintiff

about an exchange of money for unlawful entry into the subway system."  Pl.'s Br. 20.  That

misstates the record and fails to raise a genuine issue of material fact.  Officer Ting testified that

"[y]ou can actually hear what they are saying on the other side" of the station "[w]hen there are no

trains passing," but "[p]robably not those specific words."  Ting Dep. Tr. 78:10-79:9.  Officer Ting

also testified that he "probably can't recall" whether he heard those "specific words."  *Id.* at 79:16-

17.  Even if Officer Ting had not heard Plaintiff utter the precise words, "I will let you through the

gate for 5$," as stated in the criminal complaint (*see* Ex. 6), that is consistent with Officer

Martinez's statements in the criminal complaint.  In particular, in the criminal complaint, Officer

Martinez attested that Officer Ting had informed him that Plaintiff had "stated, *in substance*," that

he would "let [individuals] through the gate for $5."  Ex. 6 (emphasis added).

In addition, Plaintiff argues that Officer Ting did not observe any exchange of cash between

Plaintiff and the five individuals whose entry Plaintiff facilitated through the emergency gate.  Pl.'s

Br. 20.  Officer Ting testified that he did not "remember" whether he had seen an "exchange of

currency" between Plaintiff and the five individuals.  Ting Dep. Tr. 66:9-11.  Subsequently, he

responded "[y]es" when asked, "You saw him grab hands with one of the five people, but you

physically didn't see currency?" *Id.* at Tr. 70:16-20.  Assuming the facts in the light most favorable

to Plaintiff, even if Officer Ting did not see an exchange of currency approximately "sixty to [100]

feet away" on the northbound platform, his observation of Plaintiff "open[ing] the door and

let[ting] the family in and then engag[ing] in the act" of grabbing hands with "one of the five people" would have been sufficient to lead him to believe that Plaintiff had received currency in exchange for providing unauthorized subway access, supporting a finding of probable cause. *Id.*; *see Kee*, 12 F.4th at 161; *Bell*, 2022 WL 870589, at *6-7. Arresting officers Officer Martinez and Sergeant Rodriguez "had a reasonable basis for making the probable cause determination" based on "the version of events as narrated" by Officer Ting, which were not "clearly implausible, and they had no reason to question [Officer Ting's] veracity." *Martinez*, 202 F.3d at 635.

Other arguments advanced by Plaintiff—not all of which warrant addressing—fail to demonstrate a genuine, material issue of fact because they involve matters that are irrelevant to the probable cause inquiry or are based on "pure speculation." *Kee*, 12 F.4th at 160. For example, Plaintiff argues that "the tape alleged to have been used by Plaintiff" on the emergency exit gate "was recovered by [Officer] Martinez after Plaintiff was arrested and some distance away from where he was in a subway during rush hour"; that "Plaintiff was at a map giving directions to tourists where he was arrested"; and that there are "a number of obstacles in investigating transit related crimes," including the "collection of evidence in a subway station frequented by a great number of crowds and scammers." Pl.'s Br. 20-21. Plaintiff also contends that there are "[m]aterial issues of fact" because Officer Ting "observed Plaintiff's conduct from a distance of at least forty (40) feet away on the opposite platform with [his] vision obscured by passing trains, permanent fixtures, and crowds." *Id.* at 16-17. However, Plaintiff fails to cite any support in the record for this assertion.

Finally, Plaintiff contends that "[Officers] Samsuddin and Ting demonstrated a practice of making arrests without requisite probable cause because . . . the lack of evidence to support those observations does not justify each arrest—as demonstrated by the dismissal of all three complained-of criminal prosecutions on February 28, 2019." Pl.'s Br. 21. It is undisputed that

Plaintiff "accepted adjournments in contemplation of dismissal for all criminal charges stemming from [his] arrests." Defs.' 56.1 ¶ 36; Pl.'s Counter 56.1 ¶ 36; *see* Ex. J. As the Court noted in its June 17, 2021 Opinion on Defendants' motion for judgment on the pleadings, "a resolution by [Adjournment in Contemplation of Dismissal]" "means that the defendant's guilt is never determined." *Delgado*, 2021 WL 2473817, at \*14 (citing *Hollender v. Trump Vill. Coop., Inc.*, 58 N.Y.2d 420, 425 (N.Y. 1983)).

Accordingly, the dismissal of Plaintiff's criminal charges does not signify anything about the prosecution's evidence supporting those charges. Regardless, as the Court also explained, "whether a victim of false arrest is ultimately prosecuted or convicted is beside the point." *Id.* at \*12. Probable cause hinges on the information that was available to officers *prior to* the arrest, not on whether Plaintiff was ultimately prosecuted for a crime. "Stated differently, when faced with a claim for false arrest," the Court's "focus [is] on the validity of the *arrest*, and not on the validity of each charge." *Jaegly*, 439 F.3d at 154.

Here, Officer Ting, Officer Martinez, and Sergeant Rodriguez had probable cause to arrest Plaintiff on September 22, 2018. In sum, because there was probable cause to arrest Plaintiff on April 23, 2018, May 4, 2018, and September 22, 2018, Defendants Samsuddin, Martinez, Ting, and Rodriguez are entitled to qualified immunity and are granted summary judgment on Plaintiff's federal and state false arrest claims. *See Jenkins*, 478 F.3d at 87 ("If the . . . defendants [are] entitled to qualified immunity under federal law . . . judgment [is] similarly appropriate on [plaintiff's] state law false arrest claim."); *Marcavage*, 689 F.3d at 110 n.7 ("Because we conclude there was probable cause for Plaintiffs' arrest, *a fortiori* [defendant] would be entitled to qualified immunity on this claim."). Defendant City is also granted summary judgment on Plaintiff's state law claim for false arrest, as that claim is based solely on a theory of *respondeat superior*. *See* Am. Compl. ¶ 138; *Kass v. City of New York*, 864 F.3d 200, 213-14 (2d Cir. 2017) (dismissing

state law false arrest claim against City, which was "based solely on [plaintiff's] allegation that the City is responsible for any false arrest that was committed by the officers"); *Sherrard*, 2016 WL 7489069, at *6 ("While the City may be held vicarious liable for its employee's intentional torts in connection with plaintiff's state law claims, such liability is inappropriate here given that [officers] had probable cause to arrest and therefore did not commit an intentional tort."). Defendants' motion for summary judgment on Plaintiff's federal and state false arrests claims is granted.

### B.  Unlawful Search and Seizure

Plaintiff raises claims for unreasonable search and seizure under 42 U.S.C. § 1983 and New York law.  Am. Compl. ¶¶ 118-132.  A plaintiff may bring a claim for damages for violation of the right to be free of unreasonable searches and seizures under the Fourth Amendment of the United States Constitution and Article I, § 12 of the New York Constitution, respectively.  *See Serrano v. City of New York*, No. 16 Civ. 8105 (AKH), 2018 WL 3392869, at *8 (S.D.N.Y. July 12, 2018); *Brown v. State of New York*, 89 N.Y.2d 172, 191-92 (N.Y. 1996).  Article I, § 12 of the New York Constitution is a "verbatim adoption of the Fourth Amendment of the United States Constitution," *Brown v. City of New York*, 201 F. Supp. 3d 328, 332 (E.D.N.Y. 2016), and provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated," N.Y. Const. art. I, § 12.

 "[A] search or seizure based on probable cause" does not violate the New York State Constitution or the Fourth Amendment of the U.S. Constitution.  *Brown*, 201 F. Supp. 3d at 332; *see Serrano*, 2018 WL 3392869, at *8.  In addition, a reasonable "search incident to a lawful arrest" is generally constitutionally permissible.  *Arizona v. Gant*, 556 U.S. 332, 338 (2009); *see Serrano*, 2018 WL 3392869, at *8.  Therefore, "to the extent that there was probable cause to

support [Plaintiff's] arrests, any reasonable searches incident to [those] arrests were also lawful."
*Serrano*, 2018 WL 3392869, at *8.

Plaintiff's unreasonable search and seizure claims are redundant of his false arrest claims.
They focus on his three arrests and any searches that took place incident to those arrests. *See* Am.
Compl. ¶¶ 118-132; Pl.'s Br. 11-22; *see*, *e.g.*, Am. Compl. ¶¶ 25, 43, 64, 82, 86. As Defendants
Samsuddin, Martinez, Ting, and Rodriguez had probable cause to arrest Plaintiff, as explained
above, those Defendants are granted summary judgment on Plaintiff's unreasonable search and
seizure claims. *See Serrano*, 2018 WL 3392869, at *8. In addition, as also addressed above, the
aforementioned Defendants are entitled to qualified immunity, and therefore, to summary
judgment on Plaintiff's unreasonable search and seizure claims on that basis. *See id.* Defendant
City is also granted summary judgment on Plaintiff's state law claim for unreasonable search and
seizure because that claim is based solely on a theory of *respondeat superior*. *See* Am. Compl. ¶
124; *Sherrard*, 2016 WL 7489069, at *6.

### C. Failure to Intervene

Plaintiff alleges federal and state claims for failure to intervene. Am. Compl. ¶¶ 214-221.
"A law enforcement officer has an affirmative duty to intercede on behalf of a citizen whose
constitutional rights are being violated in his presence by other officers." *O'Neill v. Krzeminski*,
839 F.2d 9, 11 (2d Cir. 1988). "Liability may attach only when (1) the officer had a realistic
opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position
would know that the victim's constitutional rights were being violated; and (3) the officer does not
take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512
(S.D.N.Y. 2008). "Failure to intervene claims are contingent upon the disposition of the primary
claims underlying the failure to intervene claim." *Bell*, 2022 WL 870589, at *4 (quoting *Usavage
v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 599 (S.D.N.Y. 2013)).

Here, Plaintiff's failure to intervene claims are based entirely on Defendants' alleged constitutional violations underlying his false arrest and unreasonable search and seizure claims. *See* Am. Compl. ¶¶ 90, 214-221; Pl.'s Br. 11-22. As the Court has granted Defendants summary judgment on those claims, Defendants are granted summary judgment on Plaintiff's failure to intervene claims. *See Feinberg*, 2004 WL 1824373, *4 ("[S]ince Defendants had probable cause to arrest and charge the Plaintiff, Defendants' motion for summary judgment on [duty to intervene] claim is granted.").

### D. Municipal Liability

Plaintiff also asserts a claim for municipal "*Monell*" liability as to Defendant City. Am. Compl. ¶¶ 230-237. "[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under [42 U.S.C.] § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691; *see DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998). Instead, a municipal entity can be held liable for an allegedly unconstitutional act of its employees if it "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or was done "pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690-91. To make out a claim of municipal liability, a plaintiff must allege: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007).

"Here, because the Court finds that there is no independent, underlying constitutional violation, there is no basis for municipal or supervisory liability." *Mercado v. City of New York*, No. 08 Civ. 2855 (BSJ), 2011 WL 6057839, at *7 (S.D.N.Y. Dec. 5, 2011). Therefore, Defendant City is entitled summary judgment on Plaintiff's *Monell* claim. *See id.*

### E.  Other State Law Claims

Plaintiff has also brought claims for assault and battery and for negligent hiring, retention and supervision under New York law.  However, a district court "may decline to exercise supplemental jurisdiction over a claim" where "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "If it appears that the federal claims are subject to dismissal . . . or could be disposed of on a motion for summary judgment . . . the court should refrain from exercising pendent jurisdiction absent exceptional circumstances." *Kavit v. A. L. Stamm & Co.*, 491 F.2d 1176, 1180 (2d Cir. 1974).  As the Court has granted summary judgment for Defendants on Plaintiff's federal law claims, the Court abstains from exercising jurisdiction over Plaintiff's remaining state law claims. *See, e.g., Bell*, 2022 WL 870589, at *7; *Mercado*, 2011 WL 6057839, at *8.  Accordingly, those claims are dismissed.

### IV.    CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment on Counts One through Four, and Counts Fifteen, Sixteen, and Eighteen, is GRANTED.  Plaintiff's remaining causes of action (Counts Five and Seventeen) are DISMISSED without prejudice to refile in a state court of appropriate jurisdiction.  The Clerk of Court is directed to close the case.

SO ORDERED.

Dated: September 30, 2023
      New York, New York

JENNIFER H. REARDEN
United States District Judge